**NORTHWEST AIRLINES, INC.,**
Appellant,

v.

**ALASKA AIRLINES, INC.,** Appellee.

No. 19477.

United States Court of Appeals
Ninth Circuit.

Sept. 27, 1965:

Rehearing Denied Nov. 3, 1965.

Frederick B. Lacey, Shanley & Fisher, Newark, N. J., Faulkner, Banfield, Boochever & Doogan, Juneau, Alaska, for appellant.

James B. Bradley, Robertson, Monagle, Eastaugh & Annis, Juneau, Alaska, for appellee.

Before HAMLIN, MERRILL and ELY, Circuit Judges.

ELY, Circuit Judge:

Northwest Airlines, Inc., instituted a suit for declaratory relief against Alaska Airlines, Inc. In this opinion the parties will be called "Northwest" and "Alaska". The suit was brought under the authority of 28 U.S.C. § 2201, and "Northwest" appeals from an adverse judgment.

The District Court, in its reported opinion, 228 F.Supp. 322 (D.Alaska 1964), fully recites the controlling facts, and the elaborate recitation is quoted in the footnote below.[1]

---

1. "In September of 1955 the United States of America was the owner and had jurisdiction over the Island of Shemya. The air navigation facility located there was administered by the Administrator of Civil Aeronautics Administration under the provisions of the International Aviation Facilities Act (62 Stat. 450, 49 U.S.C.A. § 1151 et seq., Act of June 16, 1948, c. 473). 49 U.S.C.A. § 1159 provides, in part, as follows:

'(a) With regard to airport property and airway property in territory (including Alaska) outside the continental limits of the United States which he has acquired pursuant to this chapter or any other provision of law, the Administrator is empowered and directed

It appears that in 1955 the island of Shemya, now a part of the State of Alaska, was owned by, and under the jurisdiction of, the United States of

to do and perform, by contract or otherwise, all acts and things necessary or incident to their consolidation, operation, protection, maintenance, improvement, and administration, including but not limited to the power * * *. (3) to lease under such conditions as he may deem proper and for such periods as may be desirable (not to exceed twenty years) space or property for purposes essential or appropriate to their consolidation, operation, protection, and administration under this chapter; * * *.'

"On September 30, 1955, defendant leased the Shemya airfield from the United States of America, the United States being represented by the Administrator of Civil Aeronautics Administration. The lease contained, among others, the following provisions:

'WHEREAS, it is considered to be in the public interest that said air navigation facilities at Shemya be available to the aeronautical public on a non-discriminatory basis:'
and
'(c) Lessee shall maintain and operate as complete an air navigation facility at Shemya as is practicable including, but not limited to: landing areas, communications and navigation facilities, to be available to any civil or military aircraft of the United States or friendly foreign registry or ownership on a non-discriminatory basis.
'(d) Lessee shall furnish all available services at Shemya to the aeronautical public at fair and reasonable prices and shall, as soon as practicable hereafter and in any event within six months from the date hereof, furnish Lessor with a schedule of charges to be made for such services by Lessee at Shemya, which schedule of charges shall be approved by the Administrator of Civil Aeronautics or his designee unless found by him or his designee to be excessive, discriminatory, or unfair, in which case Lessee agrees to amend said schedule of charges to conform to those considered, in the judgment of Lessor, to be reasonable.'

"On January 5, 1959, an agreement pertaining to Alaska's use of the Shemya facilities was entered into between Northwest and Alaska. It provided, in part, as follows:

'4. Alaska agrees to hold harmless and indemnify Northwest, its officers, agents, contractors, servants and employees from all claims and liabilities for damage to, loss of, or destruction of any property of Alaska, its officers, agents, servants and employees, and the property of any other person or persons, and for injuries to or death of any person or persons which may now or hereafter arise out of or be in any way connected with the service and facilities furnished to Alaska under this agreement.'

"By reference, a schedule of charges for Shemya airport dated May 10, 1957, submitted to CAA by Northwest Airlines and approved by the Acting Administrator of the CAA on July 12, 1957, was made a part of the agreement between Northwest and Alaska. This schedule of charges provided, in part, as follows:

'J. Shemya and its facilities shall be listed in all publications as privately operated and available to the aeronautical public upon the terms and conditions set forth herein and at the sole risk of the user, and the user will specifically indemnify and hold Northwest Airlines, Inc., its employees, agents, contractors and subcontractors, harmless against any and all claims for loss, damage, injury or death arising out of or in any way connected with such use of the facilities or services provided at Shemya.'

"On July 21, 1961, while Northwest was operating the Shemya airfield under the terms of its lease agreement with the United States of America, a DC6 airplane owned by Alaska and operated by it as Flight 779, crashed and burned near the approach end of Runway 10 at Shemya. All six crew members aboard the aircraft were killed and the aircraft was destroyed or substantially damaged.

"In a separate action pending in this court (No. J-4-63 Civil), Alaska has sued Northwest alleging that its negligence was the sole and proximate cause of the accident and seeking to recover for the loss of the aircraft and attendant damages. Northwest has denied Alaska's allegations of negligence and has, in turn, alleged contributory negligence and assumption of risk on the part of Alaska. As a further affirmative defense, Northwest claims the protection of the exculpatory provisions contained in the agreement of January 5, 1959.

"Six wrongful death actions have been instituted against Northwest in other courts by personal representatives of the deceased crew members. Northwest has demanded that Alaska defend those cases,

America. On the island there was an airfield administered by the Civil Aeronautics Administration. On September 30, 1955, the United States, acting through the Administrator of the Administration, leased the facility to "Northwest". The lease recited, "WHEREAS, it is considered to be in the public interest that said air navigation facilities at Shemya be available to the aeronautical public on a nondiscriminatory basis: * * *", and it specifically required that "(d) Lessee shall furnish all available services at Shemya to the aeronautical public at fair and reasonable prices * * *".

On January 5, 1959, "Northwest" and "Alaska" executed, in Alaska, a contract by which "Alaska", a common air carrier, acquired the right to use the Shemya airport and facilities. The contract contained an indemnity provision as follows:

"4. Alaska agrees to hold harmless and indemnify Northwest, its officers, agents, contractors, servants and employees from all claims and liabilities for damage to, loss of, or destruction of any property of Alaska, its officers, agents, servants and employees, and the property of any other person or persons, and for injuries to or death of any person or persons which may now or hereafter arise out of or be in any way connected with the service and facilities furnished to Alaska under this agreement."

A schedule of charges, submitted by "Northwest" on May 10, 1957 in compliance with a requirement of the lease agreement between the United States and "Northwest", was approved by the Acting Administrator of the Civil Aeronautics Administration on July 12, 1957 and, by reference, was included as a part of the contract between "Northwest" and "Alaska". This schedule contained the following provision:

"J. Shemya and its facilities shall be listed in all publications as privately operated and available to the aeronautical public upon the terms and conditions set forth herein and at the sole risk of the user, and the user will specifically indemnify and hold Northwest Airlines, Inc., its employees, agents, contractors and subcontractors, harmless against any and all claims for loss, damage, injury or death arising out of or in any way connected with such use of the facilities or services provided at Shemya."

On July 21, 1961, an aircraft owned and operated by "Alaska" crashed and burned on the Shemya airport. The six members of the crew were killed. "Alaska", alleging that negligence on the part of "Northwest" was the sole proximate cause of the disaster, sued "Northwest" for the recovery of the damage to its aircraft. Six other suits, in which damages were sought for the deaths of the crew members, were also brought against "Northwest." "Northwest" then instituted its action in the court below seeking, in effect, a judicial declaration that it was saved from liability to "Alaska" by the exculpatory provision of the contract of January 5, 1959 and that, under the indemnity provision of the contract, "Alaska" was obliged to defend the six death actions and hold "Northwest" harmless from loss on account thereof.

■ The District Court's judgment, favoring "Alaska", was based on two conclusions, (1) that the terms of the exculpatory or indemnity provision of the "Northwest-Alaska" contract were not sufficiently clear to exonerate "Northwest" from responsibility for its sole negligence if sole negligence should be proved and (2) that the questioned

---

basing this claim upon the exculpatory provisions of the agreement.

"The combined total recovery sought by these actions approximates $3,000,000.00. This action was brought for the purpose

of obtaining a declaration of the rights existing between Alaska and Northwest under the exculpatory provisions of the agreement of January 5, 1959."

provision of the contract, should it be construed to be so broadly protective as urged by "Northwest", is invalid and unenforceable. We reject the first conclusion of the District Court, and we agree with the second.

Our court has said, in language which bears upon the construction of a contractual provision for indemnity, " * * general words alone do not necessarily import an intent to hold an indemnitor liable to an indemnitee for damages resulting from the sole negligence of the latter; it is but reasonable to require that an obligation so extraordinary and harsh should be expressed in clear and unequivocal terms." United States v. Wallace, 18 F.2d 20 (9th Cir. 1927); see also, e. g., Annot., 175 A.L.R. 8, 30 (1948). To us the agreement in question here seems perfectly clear. Repeating its unequivocal provision, "Alaska agrees to hold harmless and indemnify Northwest, * * * from all claims and liabilities * * * which may now or hereafter arise out of or be in any way connected with the service and facilities furnished to Alaska under this agreement." We see no ambiguity. The language, reasonably construed, undertook to save "Northwest" from loss even should the loss result from the negligence of "Northwest" alone. See Jacksonville Terminal Co. v. Railway Express Agency, Inc., 296 F.2d 256 (5th Cir. 1961), cert. denied, 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 18 (1962).

■ It is, of course, ordinarily desirable that competent parties be protected in their rights to make and enforce agreements between themselves. These rights are restricted by the transcendent rule that denies enforceability to a private contractual provision which would require an unlawful act or which, given effect, would gravely violate paramount requirements of public interest. Especially significant here is the decision of our own court in Air Transport Associates v. United States, 221 F.2d 467 (9th Cir. 1955). There, the Government, the owner and operator of an Alaskan airport, had granted to an air carrier the right to employ the airport's facilities in exchange for valuable consideration and the execution by the carrier of an agreement undertaking to exculpate the Government for any loss arising from the carrier's operations. Following a nighttime crash of one of the carrier's planes, alleged to have resulted from the Government's negligence in parking a ground vehicle upon an unlighted runway, the carrier sued, under the Federal Tort Claims Act, to recover for the damage to its aircraft. In defense, the Government invoked the exculpatory provision of the contract. We rejected the defense, holding that under the law of both Washington, where the contract was executed, and Alaska, where the contract was to be performed, the exculpatory provision was invalid. We held that its enforcement would be opposed to the policy interests of the general public. That decision rests upon the controlling fact that the airport was a public enterprise and its operation a public service. In looking to Washington law, we cited Griffiths v. Henry Broderick, Inc., 27 Wash.2d 901, 182 P.2d 18, 175 A.L.R. 1 (1947), and Broderson v. Rainier Nat. Park Co., 187 Wash. 399, 60 P.2d 234 (1936), and we wrote, 221 F.2d at page 472,

"In both of those cases, while the Washington Supreme Court held valid exculpatory agreements, they recognized the general law concerning this type of agreement, and cited with approval the statement of that law found in the American Law Institute, Restatement of Contracts, Volume 2, Section 575(1) as follows:

" ' "A bargain for exemption from liability for the consequences of a wilful breach of duty is illegal, and a bargain for exemption from liability for the consequences of negligence is illegal if * * * (b) one of the parties is charged with a duty of public service, and the bargain relates to negligence in the performance of any part of its duty to the public, for which it has received or been promised compensation.' " [sic]

■ We referred to a Washington statute, Wash.Rev.Code tit. 14, § 14.08.-020, which, in effect, declared that the operation of airports is a public function exercised for public purposes. We demonstrated that Alaska, then a territory, had expressly adopted the common law, Alaska Comp.Laws 1949, § 2–1–2, and we relied upon a congressional directive to the Administrator of the Civil Aeronautics Board, 49 U.S.C. § 1102(b) in concluding, "There can be no doubt that under the law of Alaska the operation of Elmendorf Field was a public enterprise." In the case at bar, the contract not only was to be performed in Alaska, but it was also executed there; hence, the question of the validity, *vel non*, of the challenged provision would ordinarily be resolved by the application of Alaskan law. When we decided Air Transport Associates, we were not directed to, nor could we find, any pointedly controlling Alaskan decision. The same is true today, so that as we adhere to our former decision, there is no intervening Alaskan determination which is opposed.

"Northwest" vigorously contends that Air Transport Associates is not dispositive, reasoning, as we understand its argument, that here, the Administrator's approval of the schedule of charges and the quoted provision therein, incorporated into the "Northwest-Alaska" contract by reference, endowed the contract with a quality of governmental approval which should require us to decide that the whole contract, including the provision in question, was enforceable as promotive and not violative of the public's interest and policy. We cannot accept this argument. The terms of the airport's lease to "Northwest" expressly declare a purpose of public interest and require that "Northwest" offer the facilities for the use of the aeronautical public. It would appear utterly incongruous to hold, as we did in Air Transport Associates, that the Government could not, by contract with a user of a government airport, relieve itself from liability for its own negligence and then, here, to hold that the Government may empower its lessee to make an indemnity agreement which might tend to inflict upon the air-traveling public the possibility of tragic consequences flowing from relaxed vigilance in the management of public airport facilities.

We cannot see, as urged by "Northwest" that the entire management and operation of the Shemya airport was so "effectively controlled by pervasive regulatory scheme" as to require us to apply the principle announced in Southwestern Sugar & Molasses Co. v. River Terminals Corp., 360 U.S. 411, 418, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959). If we were obliged to apply federal law, and not Alaskan law, we would be strongly influenced by Supreme Court decisions holding that waterways tugboat towers may not, by contract, exempt themselves from all liability for their own negligence. E. g., see Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963); Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955). In Bisso, 349 U.S. at 91, 75 S.Ct. at 632, we see the Supreme Court's views in the language, "The two main reasons for the creation and application of the rule [to prevent enforcement of release-from-negligence contracts] have been (1) to discourage negligence by making wrongdoers pay damages, * * *. The dangers of modern machines make it all the more necessary that negligence be discouraged." [2] Can it be sincerely believed

2. The second "main" reason given by the court in Bisso was "(2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." The Fifth Circuit, in Jacksonville Terminal Co. v. Railway Express Agency, Inc., 296 F.2d 256 (5th Cir. 1961), cert. denied, 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 18 (1962), emphasized, in upholding an indemnity agreement, that the contracting parties were not in an unequal bargaining position. If that consideration is critical, it is important to note here that "Northwest" through its agreement with the Government, became a monopolist in the opera-

that the public interest is better served by the discouraging of the negligence of tugboat operators than by the discouraging of negligence on the part of operators of public airports? We think not.

If, in the orderly course of litigation, it is determined that negligence, if any, on the part of "Northwest" was not a proximate cause of the disaster, the indemnity provision may afford an avenue by which it may gain some relief from "Alaska". And it is, of course, not to be implied that "Northwest" is, by this opinion, deprived of any established defenses which Alaskan law affords in actions based upon alleged negligence, nor is it divested of rights of contribution or indemnity which it may have under proper application of general law. We hold only that the exculpatory and indemnity provision, insofar as it is sought to be enforced to spare "Northwest" from liability for its own negligence, being against public policy and invalid, is unenforceable.

Affirmed.

tion of airport facilities on Shemya Island. Its airport was the only airport. It lay beneath a route regularly flown by "Alaska", and "Alaska" was in need of its use for landing and refueling its planes.

"Northwest" was in the far stronger position to insist upon the inclusion of its own terms within its contract with "Alaska".