BURGESS CONSTRUCTION
COMPANY, Appellant,

v.

STATE of Alaska, Appellee.

No. 4635.

Supreme Court of Alaska.

Aug. 1, 1980.

Gordon E. Evans, Ely, Guess & Rudd, Juneau, for appellant.

Sanford M. Gibbs, Hagans, Smith, Brown, Erwin & Gibbs, Anchorage, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

OPINION

MATTHEWS, Justice.

The State of Alaska contracted with Burgess Construction Company to build a portion of a road at Wrangell for a price in excess of $1,000,000. The contract included an indemnification clause under which Burgess was required to "indemnify and save harmless" the State from all claims brought because of injuries received by any person "on account of the operations of the said Contractor."

Ronald Lindley and Donald Kaatz, employees of Burgess, were killed while obtaining gravel for the project when their front end loader went out of control on an icy state highway, not itself part of the project. In wrongful death actions brought by personal representatives of Lindley and Kaatz it was determined that combined negligence of the State and Kaatz caused the accident; the State was found to be 85% responsible and Kaatz, 15%. Both cases were then settled by the State for substantial sums.

In the present action the State sought indemnification from Burgess. Both parties moved for summary judgment, and the State's motion was granted. Judgment was entered in favor of the State requiring Burgess to pay the total sum of $1,616,018.47 to indemnify the State. From this judgment Burgess has appealed.

In *Manson-Osberg Co. v. State*, 552 P.2d 654 (Alaska 1976), this court stated:

> The better rule in modern cases is that the unambiguous language of an indemnity clause as "reasonably construed" should be given effect, even if it does not contain words specifying indemnity for the indemnitee's own negligence. . .

> A majority of jurisdictions have rejected the old view that indemnity clauses for an indemnitee's own negligence are unenforceable because they are against public policy. . . .

> This revision in judicial thinking is attributable to the widespread contemporary use of insurance, in a variety of business and personal settings, as a means of allocating risks. *There are, however, instances when a court will not give effect to a contractual provision indemnifying the indemnitee's own negligence. These are cases where the indemnity clause tends to promote breach of a duty owing to the public at large.* [Emphasis added, citations omitted].

552 P.2d at 659–60.

Burgess first argues, relying on the language of *Manson-Osberg* emphasized above, that since in this case enforcement of the indemnity clause would tend to promote breach of a duty which the State owed to the public at large, the clause should not be enforced. The public duty exception to which we referred in *Manson-Osberg* is generally held applicable to public utilities and common carriers,[1] and is based on two principles. The first is that those to whom the exception applies should guard against the consequences of their negligence at all times; indemnity agreements, or prospective releases, are thought to eliminate their

1. Restatement of Contracts § 575 at 1080–81 (1932) provides:

   (1) A bargain for exemption from liability for the consequences of a wilful breach of duty is illegal, and a bargain for exemption from liability for the consequences of negligence is illegal if

   ⸱   ⸱   ⸱   ⸱   ⸱   ⸱

   (b) one of the parties is charged with a duty of public service, and the bargain relates to negligence in the performance of any part of its duty to the public, for which it has received or been promised compensation.

   *See* 15 Williston on Contracts § 1751 at 155–59 (3rd ed. 1972).

incentive to do so.[2] The second is that it is thought unfair to allow public service entities to impose liability-avoiding agreements on those they are supposed to serve, since the latter have no choice but to accept such agreements.[3] Because we believe that neither principle applies here, we reject Burgess' arguments that this case falls within the public duty exception.

■ The State owes a duty to the public to maintain its highways in a safe condition.[4] That duty, however, is not significantly affected by the indemnity clause in this case, for it only shifts liability for injuries sustained "on account of the operations of the said Contractor." There is no general disincentive to the State to perform its duty to the traveling public.

■ The relationship between the State and Burgess was not that of one who furnishes public services to one who uses them.[5] Burgess was not compelled to contract with the State as customers of public service organizations often are. Further, Burgess had the power to include in its bid the cost of insurance necessary to cover the liability it was required to assume. For these reasons we do not regard it as unfair for the State to have included an indemnity clause in the contract stipulations.

■ Burgess also argues that the indemnity clause should not be applied to this case because the State was negligent and Burgess was not and because the accident took place away from the construction project site. If we were to assume that Burgess was fault free, the indemnity clause would still be effective as written.[6] Most modern authorities hold that an indemnity clause such as the present one is effective to shift responsibility for an accident where the indemnitee is negligent and the indemnitor is not. *Fosson v. Ashland Oil & Refining Co.*, 309 S.W.2d 176 (Ky. 1957); *Jennings v. Ralston Purina Co.*, 201 So.2d 168 (La.App.1967); *Yonke v. Central Hudson Gas & Electric Corp.*, 52 Misc.2d 1039, 277 N.Y.S.2d 806 (1966), *aff'd* 278 N.Y.S.2d 592 (1967). *See generally* Annot., 27 A.L.R.3d 663, § 12(c) at 728–34 (1969). *See also Doloughty v. Blanchard Construction Co.*, 139 N.J.Super. 110, 352 A.2d 613, 616 (1976): "[T]here is no essential public policy impediment to an indemnitor undertaking to indemnify the indemnitee in respect of the indemnitee's own negligence. . . . [O]rdinarily the financial responsibility for the risk of injury during the course of a construction project is shifted in any event by the primary parties to their insurance carriers. . . . " We are in accord with these authorities.

Likewise, we find no significance in the fact that the accident took place away from the road which Burgess was constructing.

---

**2.** Thus, in *Northwest Airlines, Inc. v. Alaska Airlines, Inc.*, 351 F.2d 253, 257 (9th Cir. 1965) the court expressed concern about an "indemnity agreement which might tend to inflict upon the air traveling public the possibility of tragic consequences flowing from relaxed vigilance in the management of public airport facilities."

**3.** 15 Williston on Contracts § 1751 at 148; *Northwest Airlines, Inc.*, 351 F.2d at 257 n. 2.

**4.** *State v. Guinn*, 555 P.2d 530 (Alaska 1976); *State v. I'Anson*, 529 P.2d 188 (Alaska 1974); *State v. Abbott*, 498 P.2d 712 (Alaska 1972).

**5.** A railroad which, in its capacity as a carrier of goods or passengers, would be subject to the public duty exception has been held not subject to that exception as a lessor of real property, *Boston & Me. R. R. v. Howard Hardware Co.*, 123 Vt. 203, 186 A.2d 184 (1962), and

the rule limiting the right of a common carrier to contract against its own negligence in dealing with passengers and shippers does not necessarily apply to dealings between connecting carriers, who are in many aspects treated as equals, neither of which is entitled to any special privileges or protection in the making of contracts. *The Car Float No. 37*, 57 F.2d 144, 146 (2nd Cir. 1932).

**6.** Moreover, we do not accept Burgess' argument that it was free from fault. Its employee, Kaatz, was found to be negligent while acting within the scope of his employment, and this negligence would be attributable to Burgess under the principle of *respondeat superior*. *See* Restatement (Second) of Agency §§ 219 *et. seq.* (1958).

The limiting language in the indemnity clause does not refer to the geographical limits of the project; rather it speaks in terms of "the operations of the said Contractor." The accident clearly falls within that clause, for the accident victims were Burgess' employees engaged in operations in fulfillment of the contract at the time of the accident.

*Amoco Production Company v. W. C. Church Welding & Contracting, Inc.*, 580 P.2d 697 (Alaska 1978) affords some guidance here. In *Amoco*, an employee of Church was injured on a drilling platform owned by Amoco. Church and Amoco had a contract requiring Church to indemnify Amoco for injuries to Church's employees. When Amoco sought indemnity from Church, the trial judge denied Amoco's claim, distinguishing *Manson-Osberg*. In that case, the judge held the indemnitee had not been in control of the work which had caused the employee's injury, whereas in *Amoco*, the indemnitee, rather than Church, the indemnitor, was in control of the work. We rejected this reasoning, stating:

> We do not read *Manson-Osberg Co.* as being based on any such distinction. There is no question that Amoco could secure liability insurance protecting against the claim of [the injured employee]. There is, therefore, in the absence of some showing of unscrupulousness or unequal bargaining power, no reason why it could not secure the same protection from Church.

580 P.2d at 698. Similarly, in the present case it does not matter who was in control of the area in which the accident took place. The State could have purchased liability insurance protecting it from claims arising out of Burgess' contract operations. Instead, the State chose to protect itself from the same claims by requiring indemnification from Burgess. Such protection is not free, because Burgess' anticipated costs of obtaining insurance to cover the State's call for indemnification can be included as a part of its bid on the project.

■  Burgess' final argument is that its contract with the State should be regarded as one of adhesion. We recently discussed contracts of adhesion in *Stordahl v. Government Employees Insurance Co.*, 564 P.2d 63 (Alaska 1977). We held there that insurance policies would be considered contracts of adhesion and, as such, should be construed to provide the coverage which a lay person would reasonably expect them to provide.[7] We also quoted, 564 P.2d at 65–66 n. 4, (citations omitted) the following language from *Standard Oil Company of California v. Perkins*, 347 F.2d 379, 384 n. 5 (9th Cir. 1965):

> "Adhesion contract" is a handy shorthand descriptive of standard form printed contracts prepared by one party and submitted to the other on a "take-it-or-leave-it" basis. The law has recognized there is often no true equality of bargaining power in such contracts and has accommodated that reality in construing them.

Other authorities have emphasized that not only must the contract be offered on a "take-it-or-leave-it" basis, the party with the weaker bargaining power must also have little choice but to take it. In other words, the transaction should be one which as a practical matter is essential, or nearly so, from the standpoint of the weaker party. *Madden v. Kaiser Foundation Hospitals*, 17 Cal.3d 699, 131 Cal.Rptr. 882, 552 P.2d 1178, 1185–87 (1976); *Tunkl v. Regents of University of California*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 446–47 (1963); Sybert, *Adhesion Theory in California: A Suggested Redefinition and its Application to Banking*, 11 Loyola U.L.Rev. 297, 318–19 (1978). Judicial recognition of adhesion contracts has generally been limited to con-

---

**7.** *See also National Indemnity Co. v. Flesher*, 469 P.2d 360 (Alaska 1970).

sumer transactions in which form contracts are offered to the public on a mass basis.[8]

According to a recent law journal article,[9] construing an adhesion contract in accordance with the reasonable expectations of the weaker party, the remedy suggested in *Stordahl*, is but one of three common judicial responses to contracts of adhesion:

> (1) Any ambiguity in an objectionable adhesive term will be seized upon and construed most strictly against the drafter;
>
> (2) An unusual or unexpected term in an adhesion contract which falls outside the weaker party's "reasonable expectations" will be denied effect against him, unless it has been brought to his attention by express notice, as by clear, plain and conspicuous language on the face of the contract;
>
> (3) If an unreasonable adhesive term is unambiguous and has been brought to the attention of the weaker party, a court may still delete it on equitable grounds, as against public policy. [Footnotes omitted].

In the present case, we do not think it appropriate to consider the contract one of adhesion. This is a commercial contract in a specialized field for a large amount between sophisticated parties who have the advice of attorneys readily at hand. Burgess was not without options in the face of the State's form contract; it could refuse to bid, or it could calculate the cost of providing the protection required by the indemnity clause and build that cost into its bid. Moreover, none of the aforementioned remedial responses to adhesion contracts can be appropriately applied to this case. The first requires an ambiguity and none reasonably exists here. The second requires an unusual or unexpected term which has not been brought to a weaker party's attention,

and such is not the situation here. The third requires an unreasonable term and thus does not apply because, for the reasons indicated above, the indemnity clause is not unreasonable.

For the foregoing reasons, the judgment is AFFIRMED.

BOOCHEVER, J., not participating.

---

8. 11 Loyola U.L.Rev. at 322–23; Duncan, *Adhesion Contracts: A Twentieth Century Problem for a Nineteenth Century Code*, 34 La.L.Rev. 1081, 1091–93 (1974). *See generally* Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract*, 43 Colum.L.Rev. 629 (1943).

9. Sybert, *Adhesion Theory in California: A Suggested Redefinition and its Application to Banking*, 11 Loyola U.L.Rev. 297, 309–10 (1978).