Joseph H. and Edith BLUM,
Respondents–Cross–Appellants,

v.

AIRPORT TERMINAL SERVICES,
INC., Appellant,

and

Midcoast Aviation, Inc.,
Cross–Respondent,

and

The City of St. Louis, Appellant,

and

Skycraft Air Transport, Inc.,
Cross–Respondent.

Nos. 53432, 53433 and 53485.

Missouri Court of Appeals,
Eastern District,
Division Three.

Sept. 27, 1988.

Joseph A. Murphy, Peter Maginot, St. Louis, for Airport Terminal Services, Inc. and Midcoast Aviation Inc.

Robert E. Keaney, St. Louis, for City of St. Louis.

John S. Sandberg, St. Louis, for Blum.

Lawrence G. Crahan, Frank N. Gundlach, St. Louis, for Skycraft.

SMITH, Judge.

In the evening of January 9, 1984, a DC–3 cargo plane crashed shortly after take off from Lambert International Airport. The co-pilot Milko Blum, a Canadian citizen and resident, was killed. His parents brought a wrongful death lawsuit against four defendants. Appeals from that lawsuit as to all defendants were taken and have been consolidated in this court.

Airport Terminal Services, Inc. (ATS) operates under a lease from the City of St. Louis and provides refueling service for airplanes at Lambert. There is no dispute that the cause of the crash was the fueling of the DC–3 by ATS' employee with jet fuel instead of low lead aviation gasoline. ATS was sued for its negligence in misfueling the airplane. Midcoast is the parent of ATS. It was sued for the same charged negligent acts as ATS. The City of St. Louis was sued as the owner-operator of the airport on the basis that it negligently failed to regulate the practice of aircraft servicing entities at the airport in several specified ways. Skycraft is the owner of the DC–3 and the employer of both the pilot and Blum. It was sued on the basis that it negligently failed to equip its plane with devices to prevent misfueling and for the negligence of its pilot, Cox, in taking off after two previous take-off attempts were aborted.

The trial court dismissed Skycraft from the case on motion on the basis that the workers' compensation law rendered it immune from common law liability. The court directed a verdict as to Midcoast at the conclusion of the plaintiffs' case on the basis that the evidence did not establish any duty running from Midcoast to the decedent. The case as to ATS and the City was submitted to the jury which found each negligent and awarded damages of $1.5 million, apportioned 75% to ATS and 25% to the City. Plaintiffs appeal the court's orders as to Skycraft and Midcoast; ATS and the City appeal from the judgments entered against them based upon the jury verdict.

The plane landed at Lambert with a cargo of automobile parts. After unloading by the consignee, the pilot requested Tim Wandling, an ATS employee, to top off the main tanks with Avgas 100 octane low lead fuel. Wandling was the only ATS employee at the refueling station on that night. It was his first night working by himself. He had been in training for a week previous at the cargo refueling station. Two weeks was the usual training period. Prior to that time he had worked part-time as a ramp agent for ATS and in December 1983, started fueling full-time in the passenger terminal area. In that area only jet fuel was used. Wandling was eighteen years old in January 1984 and had recently graduated from high school.

Jet fuel is a highly refined kerosene with a very low octane rating. Octane is a measurement of the capacity of gasoline to burn rapidly rather than explode in an engine. The higher the octane the more consistent the power supplied to the engine. Because of its low octane rating and explosive nature, jet fuel creates great heat within an engine and when utilized in piston driven aircraft literally melts the engine. Its use in such aircraft inevitably causes engine failure, most usually on or shortly after takeoff. Until the engine failure actually begins, there is little or no indication to the pilot either from his senses or his instruments that a problem exists.

Misfueling of aircraft with jet fuel instead of aviation gas has been a recurring problem within the airline industry for several years. F.A.A. recommendations have been promulgated to address the problem, the thrust of which are to emphasize the need for clear marking and identification of the fuel contained in the tanks and vehicles used for refueling and the proper training

of personnel. Industry groups have addressed the problem also and have made available decals to be placed upon hoses and nozzles utilized for refueling so that the refueler can tell by looking at the hose or nozzle the type of fuel being utilized. The record supports a finding that the City, Midcoast and ATS were aware or should have been aware of this industry problem and the efforts to correct it.

On the night in question, Wandling went to an aviation gas truck to fill the DC–3 refueling order. He knew that jet fuel should not be used in a piston driven plane such as a DC–3. He had never, however, been informed as to why it should not be used, and not until after the crash was he made aware of the catastrophic consequences inevitably resulting from such misfueling. When Wandling attempted to start the truck it was cold and would not start. After approximately five minutes, he went to the adjacent truck, believing it to contain aviation gasoline also. Instead, it contained jet fuel. The trucks were identical in appearance. Each did contain three signs, one on the back and one on each side, identifying the contents of the truck. The size of these signs is not clear from the record but photographs would indicate they are less than six inches in height. The area was lighted but not highly illuminated. The keys to all trucks were left in the trucks so it was not necessary to return to the office for the key. None of the nozzles or hoses contained decals identifying the contents of the truck. No identification of the contents was contained on the door or in the cab of the truck. Wandling drove the truck to the airplane, got on each wing and filled the main tanks. Blum was also on the wing checking the oil, which Wandling did not know how to do.

The plane proceeded to the runway for takeoff with Cox in charge but Blum actually operating the controls. The plane started down the runway and Cox ordered the takeoff aborted. He had an intuitive feeling that the engines were not generating proper power. Nothing in the instruments indicated any problem. Cox received authority to take off in the opposite direction from the same runway and after some additional testing of the engines take-off again commenced. Cox also aborted that takeoff as a result of the same intuitive feeling. Again the instruments did not reflect any problem. '

After the second abort a call was placed by the DC–3 to ATS to verify the type of fuel placed in the plane. This call was received by an operator who found the request unusual but passed the request on to Wandling. The operator had no training in dealing with such requests. Wandling responded that the plane had been refueled with aviation gasoline which information was conveyed by the operator to the plane. Each truck contains two meters. One, the reset meter, tells how much gasoline has been utilized in each refueling, and is reset before each refueling. The other meter, the continuous flow meter, is not reset and tells how much fuel altogether has been taken from the refueling vehicle. By utilizing records of each truck, kept on clipboards in the office and the continuous flow meter it is possible to quickly tell the source of the fuel placed in any given airplane. Wandling was unaware of this method of checking. He made no checks before responding to the DC–3's request for verification of the fuel. He had received no instruction on what checks he should make if such a request was received.

After receiving verification of the fuel, and following some additional engine tests, the DC–3 took off. At that time Cox believed whatever the problem that he had felt existed had cleared up, a not uncommon occurrence with airplanes. The instruments indicated everything was normal. Shortly after takeoff and just as the wheels were retracted both engines began smoking and lost all power. The instruments showed an engine head temperature "against the stops." Cox, who assumed the controls upon the power failure, succeeded in avoiding several subdivisions and a nearby hotel, and crash-landed the plane next to a highway. He survived the crash. Blum was semi-conscious at the scene, then lapsed into a coma and died three days later from his injuries. He was twenty-two

years old with over 4000 hours flying time as a pilot. After the crash, Wandling stated he believed the only mistake he made was getting in the wrong truck. The cause of the crash was determined to be the refueling of the plane with jet fuel.

Each of the appeals involves different legal issues and will be considered separately.

## PLAINTIFF'S APPEAL AGAINST SKYCRAFT

■ In response to plaintiffs' petition Skycraft filed its motion to dismiss on the basis that the court lacked subject matter jurisdiction because the workers' compensation law furnishes the exclusive remedy against it. The court granted that motion. Subsequently, plaintiffs filed an amended petition against the remaining defendants omitting Skycraft as a defendant. Skycraft contends that action constituted a waiver or abandonment of plaintiffs' right to appeal the court's action in dismissing Skycraft. The general rule in Missouri is that an amended petition operates as an abandonment of the original petition. *Scott v. Gibbons,* 611 S.W.2d 387 (Mo.App. 1981) [4].

The cases which have established this rule arise where a plaintiff has attempted to invoke a different theory in his original petition against a defendant than the one eventually relied upon in the trial court. *Scott v. Gibbons, supra; Laux v. Motor Carriers Council of St. Louis, Inc.,* 499 S.W.2d 805 (Mo.1973) [8]; *Lightfoot v. Jennings,* 363 Mo. 878, 254 S.W.2d 596 (1953) [1–4]; *Heman v. Glann,* 129 Mo. 325, 31 S.W. 589 (1895). In *R.C. v. Southwestern Bell Telephone Co.,* 759 S.W.2d 617 (E.D. Mo.App.1988), we distinguished that situation from the one before us. Here, as there, the petition was dismissed as to Skycraft because it was immune from suit, in this case as a result of the Workers' Compensation Act. No amendment could cure that deficiency. We held in *R.C.* that where the reason for dismissal is not correctible by amendment and plaintiff amends the petition as to defendants remaining in litigation, it is not necessary to replead the allegations against the dismissed defendant in order to preserve the issue for appeal. Any other holding would create unnecessary judicial proceedings for no valid reason. We find no abandonment by plaintiffs of their cause of action against Skycraft.

Plaintiffs assert that the motion was improperly granted because the petition on its face does not establish that Blum's death is covered by the Workers' Compensation Act. In that regard they rely upon *McLeod v. Marion Laboratories, Inc.,* 600 S.W.2d 656 (Mo.App.1980) which holds that all jurisdictional facts which would bring plaintiff and defendant under the act must appear in the petition where the issue is raised by motion to dismiss. In *State ex rel. McDonnell Douglas Corporation v. Luten,* 679 S.W.2d 278 (Mo. banc 1984) (Ftnt. 1), the court stated that an employer makes a sufficient *prima facie* showing of coverage by demonstrating that plaintiff was its employee. The petition here specifically stated that Blum was Skycraft's employee. There was nothing before the court to evidence the inapplicability of the Act.

■ We turn to the merits. Sec. 287.110 RSMo 1986 provides that "this chapter shall apply to all injuries received and occupational diseases contracted in this state, regardless of where the contract of employment was made." Both Blum and Skycraft were residents of Ontario, Canada, and the employment contract had its situs there. Plaintiffs contend that the trial court erred in applying Missouri law rather than Ontario law. We agree that under a choice of laws determination the most significant contacts are in Ontario. *Kennedy v. Dixon,* 439 S.W.2d 173 (Mo. banc 1969) [6–8]. That conclusion does not impair the trial court's ruling.

Chapter 539, § 7(1) Ont.Rev.Stat. provides:

"(1) Where by the law of the country or place in which the accident happens the employee is or his dependents are entitled to compensation in respect of that, they shall be bound to elect whether they will claim compensation under

the law of such country or place, or under this Part and to give notice of such election, and, if such election is not made and the notice given, it shall be presumed that they have elected not to claim compensation under this part."

If Ontario law applies, then plaintiffs have, under that law, elected by their suit in Missouri against Skycraft to claim compensation under the law of Missouri. Missouri law restricts them to Workers' Compensation. *State ex rel. McDonnell Douglas Corp. v. Luten, supra,* [1, 2]. We are unable to understand plaintiffs' contention that the Ontario law has reference only to Missouri common law or that the Missouri compensation law loses its applicability once resort is made to Ontario law in the first instance. The ruling of the trial court dismissing Skycraft was correct and is affirmed.

## PLAINTIFFS' APPEAL AS TO MIDCOAST

 The evidence in the trial established that Midcoast and ATS were separate distinct corporate entities albeit ATS was a wholly owned subsidiary of Midcoast. "Two different corporations are in the eyes of the law, two different persons." *Elrod v. Lafayette Elevator Co.,* 379 S.W. 2d 852 (Mo.App.1964) [2]. This is true even if one corporation is the sole shareholder of the other. An exception exists only where there is such domination and control that the controlled corporation has no separate mind, will or existence of its own and is but an alter ego for its principal. *Central Cooling and Supply Company v. Director of Revenue,* 648 S.W.2d 546 (Mo.1982) [2]. Such domination must be established by evidence and is not presumed. *Collett v. American National Stores, Inc.,* 708 S.W.2d 273 (Mo.App.1986) l.c. 284. We need not set out in detail the evidence adduced at trial. It is sufficient to say that that evidence does not establish the domin-

ion and control required to authorize piercing the corporate veil. *Id.*

Plaintiffs contend that Midcoast knew of the programs to prevent misfueling and did not require ATS to implement such programs. This they contend invoked a duty based upon the concept that if one foresees that some injury might result from an act or omission to someone a duty exists to that person. That states the existence of duty too broadly. There must exist in addition to foreseeability a legal relationship sufficient to impose upon the defendant a duty to prevent the injury. *Hoover's Dairy, Inc. v. Mid–America Dairymen Inc.,* 700 S.W.2d 426 (Mo. banc 1985) [3–6]. It is upon that relationship that plaintiffs' position founders. ATS provided the refueling service which caused the crash. It also provided the employee whose negligence caused that misfueling. Midcoast did neither. ATS conducted its operation entirely separate from that of Midcoast. ATS provided the training for its employees and supplied them with the equipment to be used. In the absence of evidence of dominion and control of ATS operations by Midcoast, that company owed no duty to the customers of its subsidiary. The evidence here did not establish such dominion and control, as heretofore stated. The trial court correctly directed a verdict as to Midcoast and that action is affirmed.

## ATS APPEAL

ATS has raised five issues on its appeal. The first is a challenge to the damages instruction on the basis that it permitted the jury to consider "aggravating circumstances" in assessing damages. The instruction utilized was MAI3d 5.01 modified in accordance with MAI3d 37.03 to submit comparative fault. The instruction contained the bracketed paragraph 2 of 5.01 dealing with aggravating circumstances which may be added "if supported by the evidence." Notes on Use 5. It is ATS' contention that "aggravating circumstances" were not supported by the evidence.[1]

---

1. The City raises a similar claim which will be discussed hereafter. We note the virtually impossible task of instructing in a wrongful death case where there is evidence of aggravation as

to one defendant but not as to another. Aggravating circumstances damages are punitive in nature but are not, as with punitive damages, separately identified in the verdict. *See, Glick*

The wrongful death statute, Sec. 537.090 RSMo 1986, provides that in addition to specified damages "[t]he mitigating or aggravating circumstances attending the death may be considered by the trier of the facts ... ." Neither mitigating nor aggravating circumstances are statutorily defined. The courts, however, have adopted certain guidelines. Aggravating circumstances damages are punitive in nature. *Williams v. Excavating and Foundation Co.*, 230 Mo.App. 973, 93 S.W.2d 123 (1936) [8]. It is their purpose to punish the defendant and deter future wrongdoing. *Morrisey v. Walsh Co.*, 821 F.2d 1294 (8th Cir.1987) [11]. They are in that respect akin to punitive damages. Accordingly, an award for more than compensatory damages in a wrongful death case is permissible only if the decedent would have been entitled to punitive damages had he lived. *Dougherty v. Smith*, 480 S.W.2d 519 (Mo.App.1972) [2].

In *Sharp v. Robberson*, 495 S.W.2d 394 (Mo. banc 1973) l.c. 397, the Supreme Court discussed the circumstances of when punitive damages were recoverable in a negligence action.

> "Ordinarily [punitive] damages are not recoverable in actions for negligence, because negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct. But an act or omission, though properly characterized as negligent, may manifest such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted."

In that context the term "reckless" connotes an indifference to whether or not wrong or injury is done. *Evans v. Illinois Central R. Co.*, 289 Mo. 493, 233 S.W. 397 (banc 1921) [3]. Submission of aggravating circumstances is proper when the defendant could have reasonably been charged with knowledge of a potentially dangerous situation but failed to act to prevent or reduce the danger. *Wiseman v. Missouri Pacific R.R. Co.*, 575 S.W.2d 742 (Mo.App. 1978) [5].

It is at least questionable that the propriety of submitting aggravating circumstances is even before us. Rule 70.03 provides that counsel need not object at the trial to instructions to be given by the court providing specific objection is made in the motion for new trial. The effect of that rule has been in considerable dispute since the decisions in *Hudson v. Carr*, 668 S.W.2d 68 (Mo. banc 1984) and *Fowler v. Park Corp.*, 673 S.W.2d 749 (Mo. banc 1984). It is safe to say that counsel takes a considerable risk of non-preservation if he fails to make specific objections to instructions at the instruction conference. We find nothing in this record that any objection was interposed by either defendant to the damage instruction including a consideration of aggravating circumstances. In *Nakata v. Platte County R–3 School Dist.*, 750 S.W.2d 669 (Mo.App.1988) [7], the court held that the waiver discussed in *Fowler* relates to deviations from MAI, not to insufficiency of the evidence to support the instruction.

We have here, however, another consideration. MAI3d Committee's Comments dealing both with damages in ordinary tort cases and in wrongful death cases states:

> "During the instruction conference the parties and the Court should discuss (on the record) just what damages *are supported by the evidence* and properly can be argued to the jury. In this way, jury arguments can proceed without undue interruptions." MAI3d 4.01, 5.01, Committee's Comment. (Emphasis supplied).

In this case just such a discussion was held at the insistence of counsel for the City. Objection was interposed to certain arguments plaintiffs proposed to make. No objection was made to plaintiffs' expressed intention to argue aggravating circumstances. Accepting the rationale of *Nakata* as to other instructions, the MAI

*v. Ballentine Produce Incorporated,* 396 S.W.2d 609 (Mo.1965) [14–16]. Where comparative fault of the defendants must be determined within the format of 37.03 the defendant with no aggravating circumstances nevertheless pays his percentage of such circumstances. So also does the plaintiff if some fault is attributed by the jury to the decedent.

Committee Comment calls upon counsel to assume a greater burden of objection in the area of damages than is otherwise imposed upon counsel in regard to the insufficiency of evidence to support an instruction. In the absence of such objection, the very general damage submissions in MAI lose much of their advantage and become a trap for counsel and the court. In view of the policy behind *Fowler v. Park* and the Committee Comment to MAI, we believe that the submissibility of aggravating circumstances in this case has not been preserved for appeal.

■ Recognizing, however, that the precise scope of *Fowler v. Park* has not yet been delineated by the Supreme Court, particularly in the area of damages, we will address the merits of ATS's contention. Plaintiffs have conceded that the actions of ATS were not intentional, willful, or malicious. Plaintiffs assert, however, that the acts were reckless or showed a "want of care indicative of indifference to consequences" sufficient to support a consideration of aggravating circumstances. We agree.

The potential and seriousness of harm arising from a breach of duty is inevitably a part of the determination of whether conscious indifference to consequences has been established. The level of care required is directly proportional to the potential of harm arising from the breach. *See Duncan v. Missouri Bd. for Architects, etc.,* 744 S.W.2d 524 (Mo.App.1988) [12].

We consider the following facts to adequately demonstrate a "want of care indicative of indifference to consequences" sufficient to establish aggravating circumstances:

1. Jet fuel in a piston plane inevitably causes engine failure.

2. Misfueling is a recognized problem in the aviation industry and has been for many years.

3. Engine failure from misfueling usually occurs immediately after take off.

4. The area surrounding Lambert Field is heavily populated having subdivisions, interstate highways, hotels, and business establishments creating potential of large loss of life and of injury from a crash.

5. Wandling had one week of training in cargo fueling although the usual was at least two. That training did not include instruction of the danger of putting jet fuel in piston aircraft, the consequences of misfueling, the methods available to check the fuel actually delivered, or the procedures to be followed if a request for a fuel check were made.

6. The safety checklist and instructions furnished to Wandling dealt with the safety of ATS equipment; it did not deal with safety to prevent misfueling.

7. ATS trucks holding aviation gasoline and jet fuel were identical in appearance, were the same color, were not located in specified parking places, did not have large writing of the gas contained on the sides, did not have identification of the gas contained on the doors or in the cab. The only identification of the gas contained were three moderate size signs on the sides and back of the truck, which were dwarfed by ATS corporate identification on the side of the truck.

8. The nozzles and hoses did not contain decals or other indications of the type gasoline being delivered to the airplane.

9. Warnings or identifications as set forth in 7 and 8 were recommended in the refueling industry and by the FAA. ATS expert testified the fuel markings on trucks should be three feet high.

These facts establish that in a very high risk operation involving the possibility of catastrophic consequences to human life and health, ATS, presumably an expert in the field, did not employ the training and protections necessary to avert tragedy. That conduct reflects a want of care indicative of indifference to consequences. The "aggravating circumstances" language of the instruction was properly included.

ATS next contends that the court erred in failing to define "aggravating circumstances." That issue has not been preserved for review. MAI does not specifically require the term to be defined. Defendants did not request that it be defined.

The motion for new trial sought relief as to "aggravating circumstances" only on the basis that such circumstances had not been established. It did not refer to the failure to define. The point is not before us.

■ ATS next complains that the verdict-directing instruction was not supported by evidence as to three of five disjunctive submissions. As to two of these disjunctive submissions the error is premised upon the absence of a "duty" by ATS to do specific things, i.e., put signs in the cab of the type fuel in the truck and to mark its nozzles and hoses. This misconceives the concept of duty. The duty of ATS was to properly fuel the airplane. That it clearly did not do. The disjunctive submissions hypothesized various conduct or omissions of the defendant which plaintiffs contended were in breach of that duty. The jury was required to find that the defendant in fact engaged in such conduct or omissions and that such conduct or omissions were negligent. That is the proper way to submit the issues. Our review of the record convinces us that each of the challenged submissions was supported by the evidence. We find no merit to this point.

■ ATS also contends that some of the hypothesized acts or omissions were not established to have been the proximate cause of the misfueling. It is true that there is no certainty that had the requisite training been furnished Wandling or had more complete identification of the fuel he was using been provided that he would have correctly fueled the airplane. The law deals with probabilities not certainties. *Jackson v. Ray Kruse Construction Co.,* 708 S.W.2d 664 (Mo. banc 1986) [3]. Wandling believed the only mistake he made was getting into the wrong truck and he knew that jet fuel should not be used in place of Avgas. Whether additional warnings or identification of the fuel in the truck would have prevented him from making the mistake he did was a question for the jury to resolve. *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371 (Mo. banc 1986) l.c. 385. There is a rational basis for concluding that such additional identification, recommended within the industry, had a high probability of alerting Wandling to his mistake. In the absence of compelling evidence that the absence of such additional identification did not cause the injury the causation question was one for the jury. *Racer v. Utterman,* 629 S.W. 2d 387 (Mo.App.1981) [8–10].

ATS also raises as error a question asked by plaintiffs' counsel on voir dire which ATS contends was an attempt to commit the jury to a verdict in excess of one million dollars. We do not find the question to be one seeking a commitment, but rather a legitimate inquiry of the ability of the veniremen to return a large verdict if the evidence justified it. *Carthen v. Jewish Hospital of St. Louis,* 694 S.W.2d 787 (Mo. App.1985) [10]. We find no error.

■ ATS' final point is that the verdict was grossly excessive in awarding $1.5 million to the parents of an emancipated adult son who made no pecuniary support to his parents. It contends that the verdict is so large as to shock the conscience of the court and that it was the result of bias and prejudice arising from seven alleged errors and incidents. We have reviewed the alleged incidents and errors and find either no error or no record support for the incident.

In a wrongful death action the jury is given extraordinarily wide discretion in assessing damages. *Cannada v. Moore,* 578 S.W.2d 597 (Mo. banc 1979) [7]; *Anderson v. Robertson,* 402 S.W.2d 589 (Mo.App. 1966) [19]. Damages which plaintiffs, in a wrongful death action, can recover are (1) loss of services, consortium, companionship, comfort, instruction, guidance, counsel, training and support of the decedent, (2) pain and suffering experienced by the decedent prior to his death along with medical and funeral expenses incurred, and (3) damages for the aggravating circumstances attending the death. Sec. 537.090 RSMo 1986.

There was substantial evidence of the closeness of Blum to his parents, to his constant visitation with them at considerable inconvenience, to his physical efforts and time expended in helping them build a retirement home which plans have been

seriously compromised by Blum's death, and of the great interest and pride of the parents in Blum's rapid rise in his aviation employment. There were approximately $25,000 in medical and funeral expenses. Blum was semi-conscious at the scene of the accident and lapsed into a final coma shortly thereafter and died three days later. His injuries were substantial and to all parts of his body and he unquestionably sustained severe pain and suffering during his conscious moments. Blum's pre-impact awareness of the impending disaster can also be considered as well as the fact that as an experienced pilot he was uniquely aware of the impending crash and its probable result to him. *Pregeant v. Van American World Airways, Inc.*, 762 F.2d 1245 (5th Cir.1985) [8]. The evidence of aggravation here was substantial and in view of the catastrophic possibilities to the public generally warranted a substantial verdict. *See, Morrissey v. Welsh Co.*, 821 F.2d 1294 (8th Cir.1987). We do not find the verdict shocking to our conscience.

## APPEAL OF THE CITY OF ST. LOUIS

■ The City raises four contentions in seeking reversal. One, excessiveness of the verdict, has been addressed in the ATS appeal and need not be discussed here. The City contends that the evidence failed to establish any breach of a legal duty by the City or that any alleged failures by it proximately caused the death of Blum. It also contends that the verdict-director as to it lacked evidentiary support and that the allowance of an award for "aggravating circumstances" as to it was unjustified.

The City by its answer admitted its status as owner and operator of the airport. It receives its authority for such status from Chapter 305, RSMo 1986. Section 305.312 provides that airports are to be governed by applicable federal or state law or regulation.

14 C.F.R. § 139.51(b) provides:

"The applicant for an airport operating certificate must show that it, (or its tenant), as the fueling agent, has a sufficient number of trained personnel and procedures for safely storing, dispensing and otherwise handling fuel ... including— ... marking and labeling storage tanks and tank trucks, including identification of specific types of fuel octane and designations."

Compliance with C.F.R. requirements is a continuing duty of the airport operator. 49 U.S.C.A.App. § 1429 authorizes revocation of an airport operating certificate if, upon reinspection or reexamination by the federal administrator, safety in air commerce or transportation requires it. 14 C.F.R. 139.-17 specifically provides that the administrator may suspend or revoke an airport operating certificate for any cause that would have been grounds for denying an application for a certificate. Insufficient trained personnel and procedures and inadequate marking of fuel vehicles would be a ground for refusing certification and therefore a ground for revocation.

The duty is not only continuing but non-delegable. The general rule that an independent contractor is alone liable for injuries resulting from its or its employees negligence does not apply if the owner fails to perform a duty imposed by statute or ordinance or which would gravely violate paramount requirements of public interest. *Northwest Airlines, Inc. v. Alaska Airlines, Inc.*, 351 F.2d 253 (9th Cir.1965) [2]. To allow the City to delegate its duty to lessees such as ATS to maintain safety in its airport operations, "might tend to inflict upon the air traveling public the possibility of tragic consequences flowing from relaxed vigilance in the management of public airport facilities." *Northwest Airlines, Inc. v. Alaska Airlines, Inc.*, supra, [3].

The law, therefore, imposes upon the City a continuing non-delegable duty to assure that its tenant, ATS, has a sufficient number of trained personnel and procedures for safely dispensing fuel and adequately marking and labeling of its fuel trucks. The evidence established that the City was aware of the industry wide problem of misfueling and the efforts of industry groups to correct the problem. During the testimony of Robert H. Fairris, Assistant Director for Operations and Maintenance for the Airport, a city employee, the following evidence was supplied:

"Q. Mr. Fairris, before January 9th of 1984, did the airport supervise, check

or review the training of personnel by ATS and Midcoast to determine whether they had a sufficient number of trained personnel and procedures for safely dispensing fuel?

A. No, sir.

Q. Did the airport supervise, check or review the marking of fueling equipment as to the grade and types of fuel, again prior to January 9th of 1984?

A. For which organization?

Q. I'm sorry, ATS and Midcoast.

A. No, sir, we did not.

Q. Sir, you learned of the regulation [14 C.F.R. 139.51(b)] the Court read for the first time, when?

A. Shortly after the incident in January of '84 ...

Q. Let me be specific. Prior to January 9th of 1984, did the airport ever brief ATS or Midcoast on safety requirements for their fueling operations?

A. No, sir."

It was the practice of the airport to follow the guidelines and recommendations of Advisory Circulars from the F.A.A. which the airport regularly receives. The city would enforce such circulars as they applied to their tenants. An advisory circular issued in 1976 dealt specifically with aircraft fuel control and the dangers of inadvertent mixing of turbine (jet) and piston fuels. That circular recommended tank vehicles be conspicuously marked with color contrasting lettering at least twelve inches high on the sides and rear of the vehicle. In addition color-coded nozzles and hoses were recommended and emphasis was placed upon the training of fueling personnel. The city rejected the nozzle coding suggestions because they would be inconvenient if nozzles were transferred from truck to truck.

An officer of ATS testified that it did not have regular meetings with the airport officials about ATS operations and that the only times it really did have "infrequent meetings" is about renegotiating the lease. He also testified that to his knowledge the airport officials did not review or inspect or analyze ATS fueling procedures or fueling equipment.

We have no difficulty finding the evidence sufficient to establish a breach by the City of its continuing non-delegable duty. It is a permissible inference that had the city not breached that duty Wandling would not have misfueled the airplane. In *Jackson v. Ray Kruse Construction Co., supra*, [3], the court stated that the law deals with probabilities not certainties. If the jury could conclude that it is probable that greater safety precautions by the City would have prevented the accident that is sufficient to satisfy the element of proximate cause. *Nesselrode v. Executive Beechcraft, Inc., supra*, [4]. A jury here could and did so conclude.

We have reviewed the City's contention that the verdict director lacked evidentiary support. The duty imposed upon the City and the evidence establishing its breach of that duty were sufficient to support the specific breaches set forth in the instruction. We find no merit to this point.

■ Finally the City contends the evidence was insufficient to authorize the jury to assess damages against it based on "aggravating circumstances." Given the potential for disaster to both crew personnel and the general public, the federal regulation imposing an affirmative supervisory duty on the City, and the failure of the key city employee to be aware of that duty or to in any way seek to comply with the duty, we do not find the submission of aggravating circumstances erroneous. It was the duty of the City to see that operations at its airport were conducted safely by itself and its tenants. For its key employee to be unaware of the existence of that duty and to fail to even investigate or discuss such safety with ATS evidences a complete indifference to and conscious disregard for the safety of others.

Skycraft motion taken with the case is denied as moot. The judgment of the trial court is in all respects affirmed.

KAROHL, P.J., and KELLY, J., concur.