Holly F. KISSICK, as Personal Representative of the Estate of Michael W. Kissick, Petitioner,

v.

Kay M. SCHMIERER, as Personal Representative of the Estate of Otto Schmierer, Judith Jonsen, as Personal Representative of the Estate of Alan Jonsen, and Linda LeBlanc, as Personal Representative of the Estate of Ernest LeBlanc, Respondents.

No. S–3977.

Supreme Court of Alaska.

Aug. 23, 1991.

Mark A. Dombroff, John K. Henderson, Katten, Muchin, Zavis & Dombroff, Washington, D.C., and John K. Brubaker, Raymond E. Plummer, Delaney, Wiles, Hayes, Reitman & Brubaker, Anchorage, for petitioner.

Dennis M. Mestas, Mestas & Schneider, Anchorage, for respondent Schmierer.

Jeffrey M. Feldman, Eric T. Sanders, Kristen Young, Young, Sanders & Feldman, Anchorage, for respondents Jonsen and LeBlanc.

Before RABINOWITZ, C.J., and MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 4, 1988, Michael Kissick invited Alan Jonsen, Ernest LeBlanc, and Otto Schmierer to fly with him to Coghill Lake for a fishing trip. Kissick and the three passengers died when the plane crashed into a mountain bordering Burns Glacier.

Kissick was a major in the United States Air Force and a member of the Air Force Elmendorf Aero Club. The Aero Club is an instrumentality of the Air Force, estab-

lished and managed according to Air Force Regulation 215–12. The plane that crashed was owned by the Aero Club and rented by Kissick. The plane was kept at a lake on the Air Force base. The three passengers were civilians. Aero Club members are authorized to rent the Club's planes and may fly with non-member civilian passengers if Air Force regulations are satisfied. Of primary concern in this case is the requirement that passengers sign AF Form 1585 agreeing not to bring a claim against "the US Government and/or its officers, agents, or employees, or Aero Club members ... for any loss, damage, or injury to my person or my property which may occur from any cause whatsoever...."

Prior to departure, Supervisor of Flying Steven Wright directed Jonsen, LeBlanc, and Schmierer to complete and sign Air Force Form 1585, Covenant Not to Sue and Indemnity Agreement, and the data in the emergency notification section of an Aero Club membership application. The passenger only needs to print his name near the top and sign and date the bottom to complete the Covenant Not to Sue. Wright did not explain the forms in any detail to Jonsen, LeBlanc and Schmierer, but he testified that he "usually tell[s] people who go flying: 'This is a covenant not to sue in the event of an accident. It indicates that you won't sue the Air Force or the Aero Club.'"

Wright also checked Kissick's qualifications, and reviewed the flight plan and weather with him. Although Wright did not specifically discuss the risks of flying in a small aircraft with the passengers, he testified that they nonetheless "knew about the limitations regarding the weather and the aircraft, the size, the weight and all that [because t]hey were all present and, I assumed, listened to this conversation that was going on."

Following the accident, the widows of Jonsen, LeBlanc and Schmierer filed wrongful death claims against the Kissick estate. Kissick asserted as an affirmative defense that AF Form 1585 barred all claims. The parties made cross-motions for summary judgment regarding the ef-fect to be given the covenant. In addition, Kissick argued that Air Force regulations preempted plaintiffs' state tort claims. The trial court ruled that federal preemption was not an issue, and strictly interpreted the form according to state law. It concluded that the agreement did not bar wrongful death actions because "[t]he covenant doesn't even talk about death.... It is ambiguous. The ambiguity must be construed against the government, against the parties seeking to rely on the exculpatory provision." Kissick sought review.

DISCUSSION

A. *Preemption*

Kissick contends that respondents' claims are barred by operation of the preemption doctrine since signing the covenant not to sue was required by an Air Force regulation. Kissick also asserts that inclusion of the agreement in a regulation alters the court's review authority and requires the Aero Club's form to be interpreted like a statute or regulation instead of like other exculpatory contracts. If the covenant is interpreted as a statute or regulation, the purposes of the enacting body and the plain language of the regulation will be given primary consideration, and the covenant will not be subjected to the strict scrutiny that exculpatory clauses customarily must survive to be upheld. In Kissick's view, in enacting the regulation the Air Force intended to shield itself from all liability, and the omission of the word "death" is a technicality that should not act to interfere with the regulation's clear purpose.

Cases have evaluated covenants not to sue promulgated by the federal government in accordance with state law as though the parties thereto were private individuals or entities. *Rogow v. United States*, 173 F.Supp. 547 (S.D.N.Y.1959), was an action by the widow of a free lance writer who died when the Air Force plane on which he was a passenger crashed. Prior to the flight, Mr. Rogow signed a covenant not to sue that was similar to the Aero Club's agreement except that it expressly released claims arising "on account of my death." *Id.* at 550–51 n. 7. The court applied New York law to interpret

the covenant and found that it did not bar the claim.[1] Further, even though one can infer that the covenant was the product of administrative regulations, the court did not interpret it differently from similar private covenants. *See* cases cited *id.* at 551–52.

A similar situation was considered in *Montellier v. United States*, 202 F.Supp. 384 (E.D.N.Y.1962), *aff'd* 315 F.2d 180 (2nd Cir.1963). Plaintiff's husband, a civilian reporter, died in the crash of an Air Force plane after signing a covenant not to sue. The covenant resembled the Aero Club's except that it included "death." The court interpreted the covenant in light of Massachusetts's Death Act and held that the covenant did not bar plaintiff's action. *Id.* at 394. In deciding whether Mr. Montellier had assumed the risk of a crash, the court relied on cases in which the defendant was not a governmental entity. *See also Green v. United States*, 709 F.2d 1158, 1165 (7th Cir.1983) (in a medical malpractice action against an Air Force doctor the effect of a release from liability must be determined according to the law of the state where the tort occurred); 1 S. Speiser & C. Krause, *Aviation Tort Law* § 3:53, at 300 (1978) (government pre-flight covenants are governed by state rather than federal law).

In the absence of a direct conflict, state law is only preempted "when Congress intends that federal law occupy a given field." *California v. ARC America Corp.*, 490 U.S. 93, 100, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). There has been no showing that Congress intended to occupy the state tort field when it authorized the Secretary of the Air Force to promulgate regulations regarding Aero Clubs. The existence of regulations governing the operation of Aero Clubs is not enough to find that state tort actions are preempted.[2] The applicable regulation[3] merely requires passengers to execute the form covenant not to sue. The regulation does not suggest that the covenant should not be construed according to state law. If federal law was intended to govern the meaning of the covenant, this intention could have been directly stated. Similarly, if the regulation itself had been meant to bestow immunity, that intention could readily have been expressed.

Based on the foregoing, we conclude that the covenant is to be construed like a covenant between private parties in accordance with Alaska law.

### B. *The Exculpatory Agreement as Interpreted by State Law*

As noted, the trial court ruled that the covenant not to sue was not a bar to respondents' claims under state law. The court noted that exculpatory agreements are strictly construed against the party seeking immunity from suit and found that since the word "death" was missing from the covenant, the term "injury" was ambiguous and must be construed to exclude death. We agree.

Although there are no Alaska cases directly on point,[4] it is well settled that

---

1. Evidently, courts in New York "refused to give effect to releases of this kind where the injured plaintiff had not received a gratuitous benefit from the defendant, such as a free pass." *Rogow,* 173 F.Supp. at 551. It was important to the court that Rogow had been hired by the Air Force to write the script for a recruiting film, and that the Air Force had suggested that he fly on military planes to gather information. Thus, Rogow had not received a gratuitous benefit from the Air Force. In this regard the case may be distinguished from the present dispute as the passengers in this case would have received a gratuitous benefit if the plane had not crashed.

2. *See Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 256, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984) (recovery of damages based on state law is not preempted even though the generation of

nuclear power is exclusively regulated by a federal agency).

3. AFR 215–12, ¶ 2–15 provides:

   AF Form 1585, Covenant Not to Sue and Indemnity Agreement. Aero club members or passengers who are not active duty members of the Armed Forces of the United States will not operate or ride in an aero club aircraft until they execute AF Form 1585. A new covenant must be accomplished annually. A parent or legal guardian will execute the document on behalf of a minor.

4. In a line of cases interpreting indemnity agreements in construction contracts allocating the risk of injuring third parties, we have held "that the unambiguous language of an indemni-

ambiguities in a pre-recreational activity exculpatory clause will be resolved against the party seeking exculpation, and that to be enforced the intent to release a party from liability for future negligence must be conspicuously and unequivocally expressed. *See, e.g., Gross v. Sweet,* 49 N.Y.2d 102, 424 N.Y.S.2d 365, 368, 400 N.E.2d 306, 309 (1979) ("[I]t has been repeatedly emphasized that unless the intention of the parties is expressed in unmistakable language, an exculpatory clause will not be deemed to insulate a party from liability for his own negligent acts."). *Ferrell v. Southern Nevada Off–Road Enthusiasts Ltd.,* 147 Cal. App.3d 309, 195 Cal.Rptr. 90, 95 (1983), is representative.

> [T]o be effective, an agreement which purports to release, indemnify or exculpate the party who prepared it from liability for that party's own negligence or tortious conduct must be clear, explicit and comprehensible in each of its essential details. Such an agreement, read as a whole, must clearly notify the prospective releasor or indemnitor of the effect of signing the agreement.

The efficacy of this salutory rule is especially applicable in the case before us in which the adhesive agreement was prepared by one of the purported releasee-indemnitees, and was presented on a take-it-or-leave-it basis as a condition of being allowed to enter the race.

Professors Williston and Prosser have also expressed the view that exculpatory provisions are disfavored.

> Generally, an indemnity agreement will not be construed to cover losses to the indemnitee caused by his own negligence unless such effect is clearly and unequivocally expressed in the agreement.

> A promise not to sue for future damage caused by simple negligence may be

valid. Such bargains are not favored, however, and, if possible, bargains are construed not to confer this immunity.

15 S. Williston, *A Treatise on the Law of Contracts* § 1750A, at 143–45 (3d ed.1972) (footnotes omitted); *see also* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 68, at 483–84 (5th ed.1984) (footnotes omitted):

> If an express agreement exempting the defendant from liability for his negligence is to be sustained, it must appear that its terms were brought home to the plaintiff; and if he did not know of the provision in his contract, and a reasonable person in his position would not have known of it, it is not binding upon him, and the agreement fails.... It is also necessary that the expressed terms of the agreement be applicable to the particular misconduct of the defendant, and the courts have strictly construed the terms of exculpatory clauses against the defendant.... If the defendant seeks to use the agreement to escape responsibility for the consequences of his negligence, then it must so provide, clearly and unequivocally, as by using the word "negligence" itself.

■ Courts in a number of contexts have recognized that an ambiguity exists as to whether the term "injury" includes death. *Tobin v. Beneficial Standard Life Ins. Co.,* 675 F.2d 606 (4th Cir.1982) (clause in insurance policy which excluded coverage for injury found to be ambiguous with respect to whether injury included death; this ambiguity was resolved against the insurer); *Ziolkowski v. Continental Casualty Co.,* 365 Ill. 594, 7 N.E.2d 451 (1937) ("injury" in insurance policy exclusion did not include death); *Cal–Farm Ins. Co. v. TAC Exterminators,* 172 Cal.App.3d 564, 218 Cal.Rptr. 407, 411 (1985) (whether "in-

ty clause as 'reasonably construed' should be given effect, even if it does not contain words specifying indemnity for the indemnitee's own negligence." *Manson–Osberg Co. v. State,* 552 P.2d 654, 659 (Alaska 1976); *see also Burgess Construction Co. v. State,* 614 P.2d 1380 (Alaska 1980); *C.J.M. Constr., Inc. v. Chandler Plumbing & Heating, Inc.,* 708 P.2d 60 (Alaska 1985). We are unwilling to apply this approach in a non-

commercial setting. The situation presented in these cases can be distinguished from the current one in a number of respects: owners and contractors are usually in essentially equal bargaining positions; contractors can incorporate the cost of insurance to cover indemnification into their bids; and the interpretation of these agreements does not affect the injured party's recovery, but only who pays it.

jury" includes death held to be ambiguous).[5] In view of this ambiguity, the rule of construction disfavoring exculpatory agreements applies. The covenant therefore does not bar respondents' claims.

The decision of the superior court is AFFIRMED.

COMPTON, J., dissents.

BURKE, J., disqualified.

MOORE, J., not participating.

COMPTON, Justice, dissenting.

For the purpose of this case, I will assume that the court's decision on federal preemption is correct. I will assume also that the Covenant Not to Sue and Indemnity Agreement should be construed according to state law. However, I am unpersuaded that the covenant is ambiguous, and therefore dissent.

The covenant, signed by Otto Schmierer, Alan Jonsen and Ernest LeBlanc, provides:

> I, for myself, my heirs, administrators, executors, and assignees, hereby covenant and agree that I will never institute ... any demand, claim, or suit against ... Aero Club members, participants, [or] users, ... for any loss, damage, or injury to my person or my property which may occur from any cause whatsoever as a result of my participation in the activities of the Aero Club.

The statute under which the personal representatives of the estates of each of the above signators are suing the estate of Aero Club member Michael W. Kissick, AS 09.55.580, provides for recovery of an amount exclusively for the benefit of the decedent's spouse, children or other dependents, if there are any, or the decedent's estate, if there are not. If there is a spouse, children or other dependents, the award should fairly "compensate for the injury resulting from the death" considering at least the following factors: "(1) deprivation of the expectation of pecuniary benefits to the beneficiary or beneficiaries

...; (2) loss of contributions for support; (3) loss of assistance or services ...; (4) loss of consortium; (5) loss of prospective training and education; (6) medical and funeral expenses." As is clear from the statute and cases construing it, *see*, e.g., *Tommy's Elbow Room, Inc. v. Kavorkian*, 727 P.2d 1038 (Alaska 1986), it is injury to beneficiaries for which compensation is being awarded, the compensation representing losses of various kinds reduced to dollars and cents.

In construing the covenant, the court declines to apply the "reasonable construction" rule articulated in *Manson–Osberg Co. v. State*, 552 P.2d 654, 659 (Alaska 1976), and similar cases. Op. n. 4. However, reasonable construction is intended to resolve ambiguities ("unambiguous language ... as 'reasonably construed'"). Here the court strictly construes "injury" to create an ambiguity, implicitly conceding that the language in the covenant, reasonably construed, is not ambiguous. Otherwise, *Manson–Osberg* adds nothing to the debate. Furthermore, "injury" is construed without reference to the language preceding and following it, and without reference to the statute under which the suit has been brought.

I am incredulous that the phrase "any loss, damage, or injury to my person or my property" can be construed, whether "reasonably" or "strictly," to exclude death. This is particularly so in the context of AS 09.55.580. For this reason alone I do not agree that the covenant does not state a viable defense.

Even if the language in this covenant is ambiguous, it is to be strictly construed only against the party who prepared it. However, it must be remembered that Michael W. Kissick did not prepare the covenant at issue; the United States Air Force did. It is Michael W. Kissick's estate, not the United States Air Force, that is seeking to enforce this covenant. Thus I question application of the strict construction rule at all. If the strict construction rule is inap-

---

**5.** There is also contrary authority. *See Falkner v. Hinckley Parachute Center, Inc.*, 178 Ill.App.3d 597, 127 Ill.Dec. 859, 533 N.E.2d 941 (1989).

plicable, the covenant should be upheld as stating a viable defense to the wrongful death actions.