NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| VANESSA L. LANGLOIS, Personal Representative of the Estate of STEPHEN J. MORTON, | ) ) ) ) | Supreme Court No. S-16422 |
| | ) | Superior Court No. 3AN-15-06866 CI |
| Appellant, | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND JUDGMENT[*] |
| NOVA RIVER RUNNERS, INC., | ) | |
| | ) | No. 1669 – March 21, 2018 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Pamela Scott Washington, Judge pro tem.

Appearances: Mara E. Michaletz and David K. Gross, Birch Horton Bittner & Cherot, Anchorage, for Appellant. Howard A. Lazar, Scott J. Gerlach, and Luba K. Bartnitskaia, Delaney Wiles, Inc., Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices. Winfree, Justice, with whom Carney, Justice, joins, dissenting.

I. INTRODUCTION

The estate of a man who drowned on a rafting trip challenged the validity of the pre-trip liability release. The superior court granted summary judgment in favor

---

[*]    Entered under Alaska Appellate Rule 214.

of the rafting company. Because there were no genuine issues of material fact and the release was effective under our precedent, we affirm.

## II.   FACTS AND PROCEEDINGS

In May 2013 Stephen Morton took part in a whitewater rafting trip on Six Mile Creek near Hope. The trip was conducted by NOVA River Runners (NOVA). This case arises out of Morton's tragic death by drowning after his raft capsized.

### A.   The Release

Before embarking on a rafting trip, participants typically receive and sign NOVA's liability release (the Release). The Release is provided as a single two-sided document. One side is entitled "Participant's Acknowledgment of Risks" and begins with a definition of activities: "any adventure, sport or activity associated with the outdoors and/or wilderness and the use or presence of watercraft, including but not limited to kayaks, rafts, oar boats and glacier hiking and ice climbing equipment, including crampons, ski poles, climbing harnesses and associated ice climbing hardware." The Release then states:

> Although the concessionaire has taken reasonable steps to provide you with appropriate equipment and/or skilled guides so you can enjoy an activity for which you may not be skilled, we wish to remind you this activity is not without risk. Certain risks cannot be eliminated without destroying the unique character of the activity.

The Release then provides a list of "some, but not all" of the "inherent risks," including "[m]y . . . ability to swim . . . and/or follow instructions" and "[l]oss of control of the craft, collision, capsizing, and sinking of the craft, which can result in wetness, injury, . . . and/or drowning." The Release next asks participants to affirm that they possess certain qualifications, including physical capability and safety awareness. The last

section of the first side purports to waive liability for the negligent acts of NOVA and its employees. There is no designated space for signatures or initials on this side.

At the top of the other side, participants are asked to acknowledge that "[They] have read, understood, and accepted the terms and conditions stated herein" and that the agreement "shall be binding upon [the participant] . . . and [their] estate." No terms or conditions appear on this side. There are then three signature blocks where up to three participants can sign, with space to include an emergency contact, allergies, and medications.

Brad Cosgrove, NOVA's "river manager" for this trip, did not recall whether Morton read the Release before signing it, but stated that "[n]obody was rushed into signing" and that he "physically showed each participant" both sides of the Release. Bernd Horsman, who rafted with Morton that day, stated that he recalled "sign[ing] a document that briefly stated that you waive any liability in case something happens" but thought the document only had one side. He did not recall "someone physically show[ing]" the Release to him, but he wasn't rushed into signing it. Both Horsman's and Morton's signatures appear on the Release.

## B.    The Rafting Trip

The rafting trip consisted of three canyons. NOVA would routinely give participants the opportunity to disembark after the second canyon, because the third canyon is the most difficult. Morton did not choose to disembark after the second canyon, and his raft capsized in the third canyon. Cosgrove was able to pull him from the river and attempted to resuscitate him. NOVA contacted emergency services and delivered Morton for further care, but he died shortly thereafter.

## C.    Legal Proceedings

Morton's widow, Vanessa Langlois, brought suit as the personal representative of Morton's estate (the Estate) in May 2015 under AS 09.55.580

(wrongful death) and AS 09.55.570 (survival), requesting compensatory damages, plus costs, fees, and interest. The Estate alleged that NOVA was negligent and listed multiple theories primarily based on the employees' actions or omissions.

NOVA moved for summary judgment in November 2015, arguing that the Release barred the Estate's claims. NOVA supported its position with the signed Release and affidavits from NOVA's owner and Cosgrove. The Estate opposed and filed a cross-motion for summary judgment to preclude NOVA from relying on the Release. The parties then stipulated to stay formal discovery until the court had ruled on these motions, but agreed on procedures for conducting discovery in the interim if needed. Pursuant to the stipulation, the parties deposed Horsman and filed supplemental briefing.

In June 2016 the superior court granted NOVA's motion for summary judgment and denied the Estate's, reasoning that the Release was valid under our precedent. This appeal followed. The Estate argues that the superior court erred in granting summary judgment because the Release did not satisfy the six elements of our test for a valid waiver.

## III. STANDARD OF REVIEW

"We review grants of summary judgment de novo, determining whether the record presents any genuine issues of material fact."[1] "If the record fails to reveal a genuine factual dispute and the moving party was entitled to judgment as a matter of law,

---

[1] *Donahue v. Ledgends, Inc.*, 331 P.3d 342, 346 (Alaska 2014) (citing *Hill v. Giani*, 296 P.3d 14, 20 (Alaska 2013)).

the trial court's grant of summary judgment must be affirmed."[2]  "Questions of contract interpretation are questions of law that we review de novo . . . ."[3]

## IV.  DISCUSSION

Alaska Statute 09.65.290 provides that "[a] person who participates in a sports or recreational activity assumes the inherent risks in that sports or recreational activity and is legally responsible for . . . death to the person . . . that results from the inherent risks in that sports or recreational activity."  The statute does not apply, however, to "a civil action based on the . . . negligence of a provider if the negligence was the proximate cause of the . . . death."[4]  Thus, in order to avoid liability for negligence, recreational companies must supplement the statutory scheme by having participants release them from liability through waivers.

Extrapolating from principles articulated in three earlier cases,[5] we recently adopted, in *Donahue v. Ledgends, Inc.*, a six-element test for finding effective waiver:

> (1) the risk being waived must be specifically and clearly set forth (e.g. death, bodily injury, and property damage); (2) a waiver of negligence must be specifically set forth using the word "negligence"; (3) these factors must be brought home to the releasor in clear, emphasized language . . . ; (4) the release must not violate public policy; (5) if a release seeks to exculpate a defendant from liability for acts of negligence

---

[2]     *Id.* (citing *Kelly v. Municipality of Anchorage*, 270 P.3d 801, 803 (Alaska 2012)).

[3]     *Sengul v. CMS Franklin, Inc.*, 265 P.3d 320, 324 (Alaska 2011) (citing *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1000 n.1 (Alaska 2004)).

[4]     AS 09.65.290(c).

[5]     *See Donahue*, 331 P.3d at 346-48 (discussing *Ledgends, Inc. v. Kerr*, 91 P.3d 960 (Alaska 2004); *Moore v. Hartley Motors, Inc.*, 36 P.3d 628 (Alaska 2001); and *Kissick v. Schmierer*, 816 P.2d 188 (Alaska 1991)).

unrelated to inherent risks, the release must suggest an intent to do so; and (6) the release agreement must not represent or insinuate standards of safety or maintenance.[6]

The Estate argues that NOVA's release does not satisfy this test. We analyze these six elements in turn and conclude that NOVA's Release is effective.[7]

### A. The Release Specifically And Clearly Sets Forth The Risk Being Waived.

The Estate first argues that the Release was not a "conspicuous and unequivocal statement of the risk waived" because the Release was two-sided and the sides did not appear to incorporate each other.[8] For support, the Estate cites an "analogous" Uniform Commercial Code (UCC) case from Florida for the proposition that "a disclaimer is likely inconspicuous where 'there is nothing on the face of the writing to call attention to the back of the instrument.' "[9] The Estate points out that the release in *Donahue* had two separate pages, and the participant initialed the first page and signed the second.[10] The Estate also identifies Horsman's confusion about whether the Release had one or two sides as evidence that the Release was not conspicuous, raising

---

[6] *Id.* at 348. In *Donahue,* a woman sued a rock climbing gym after she broke her tibia by falling a few feet onto a mat at the instruction of an employee, and we concluded that the release barred her negligence claim. *Id.* at 344-45.

[7] Our review of the record reveals no genuine issues of material fact with respect to the existence and terms of the Release.

[8] *See Donahue*, 331 P.3d at 348.

[9] The Estate quotes *Rudy's Glass Constr. Co. v. E. F. Johnson Co.*, 404 So. 2d 1087, 1089 (Fla. Dist. App. 1981) (citing *Massey-Ferguson, Inc. v. Utley*, 439 S.W.2d 57 (Ky. 1969); *Hunt v. Perkins Mach. Co.*, 226 N.E.2d 228 (Mass. 1967)).

[10] *See Donahue*, 331 P.3d at 345.

possible issues of material fact about whether Morton would have been aware of the other side or whether Cosgrove actually showed each participant both sides.[11]

We note that participants in a recreational activity need not read a release for it to be binding if the language of the release is available to them.[12] We conclude that NOVA's Release was sufficiently clear, even without an initial block on the first side. The signature page stated, "I have read, understood, and accepted the terms and conditions stated herein," but no terms and conditions appeared on this side. A reasonable person, after reading the word "herein," would be on notice that the document had another side.

The Estate also argues that NOVA's Release "does not specifically and clearly set forth the risk that the NOVA instructors may have been negligently trained or supervised, or that they may give inadequate warning or instructions." But NOVA's Release, like the release in *Donahue*, "clearly and repeatedly disclosed the risk of the specific injury at issue"[13] — here, death by drowning. Like the plaintiff in *Donahue*, the Estate, "[r]ather than focusing on [the] injury[,] . . . focuses on its alleged cause,"[14] i.e., negligent training or instruction. But the Release covers this risk as well; it indemnifies the "Releasees" in capital letters from liability for injury or death, "whether arising from negligence of the Releasees or otherwise," and specifically defines "Releasees" to include "employees." In *Donahue*, we also observed that "[i]t would not be reasonable

---

[11]     The Estate raises these arguments outside the context of *Donahue*, but we address them here.

[12]     *See Donahue*, 331 P.3d at 349 (citing *Lauvetz v. Alaska Sales & Serv.*, 828 P.2d 162, 164-65 (Alaska 1991)).

[13]     *Id.* at 348.

[14]     *Id*. at 349.

to conclude that [the defendant] sought a release only of those claims against it that did not involve the acts or omissions of any of its employees."[15] Thus, the Estate's argument that NOVA's Release "does not specifically and clearly set forth the risk that the NOVA instructors may have been negligently trained or supervised" is not persuasive.

**B.     The Release Uses The Word "Negligence."**

*Donahue* provides that "a waiver of negligence must be specifically set forth using the word 'negligence.' "[16] The Estate argues that the Release's "references to negligence are inconsistent," and therefore it does not fulfill our requirement that a release be "clear, explicit[,] and comprehensible in each of its essential details."[17] But we concluded in *Donahue* that similar language satisfied this element.

The release in *Donahue* provided:  "I hereby voluntarily release, forever discharge, and agree to indemnify and hold harmless the [defendant] from any and all claims, demands, or causes of action, . . . including any such claims which allege negligent acts or omissions of [the defendant]."[18] We emphasized that "[t]he phrase 'any and all claims' is thus expressly defined to include claims for negligence."[19]

Here, the Release reads, in relevant part:

> I . . . HEREBY RELEASE NOVA . . . WITH RESPECT TO
> ANY AND ALL INJURY, DISABILITY, DEATH, or loss,
> or damage to persons or property incident to my involvement
> or participation in these programs, WHETHER ARISING

---

[15]     *Id.*

[16]     *Id.* at 348.

[17]     *Kissick v. Schmierer*, 816 P.2d 188, 191 (Alaska 1991) (quoting *Ferrell v. S. Nev. Off-Road Enthusiasts, Ltd.*, 195 Cal. Rptr. 90, 95 (Cal. App. 1983)).

[18]     *Donahue*, 331 P.3d at 345.

[19]     *Id.* at 349.

FROM NEGLIGENCE OF THE RELEASEES OR OTHERWISE, to the fullest extent permitted by law.

I . . . HEREBY INDEMNIFY AND HOLD HARMLESS all the above Releasees from any and all liabilities incident to my involvement or participation in these programs, EVEN IF ARISING FROM THEIR NEGLIGENCE to the fullest extent permitted by law.

NOVA's Release uses the word "negligence" twice, and there is no material difference between the "any and all claims" language used in *Donahue* and the "any and all liabilities" language used here. We therefore conclude that the Release specifically set forth a waiver of negligence.

##### C.     The Release Uses Simple Language And Emphasized Text.

*Donahue* provides that the intent of a release to waive liability for negligence "must be brought home to the releasor in clear, emphasized language."[20] The Estate argues that the Release fails to use clear language or adequately define the "activity" it covered and thus does not waive liability for negligence. This argument does not withstand the application of *Donahue*.

In *Donahue*, the clauses addressing negligence "[did] not appear to be 'calculated to conceal' " and were "in a logical place where they [could not] be missed by someone who reads the release."[21] Here, the Release uses capital letters to highlight the clauses waiving negligence. Though the clauses fall near the bottom of the page, they were certainly "in a logical place where they [could not] be missed by someone who reads the release" from start to finish, and thus under *Donahue* they were not "calculated to conceal." And though these clauses contain some legalese, "releases should be read 'as a whole' in order to decide whether they 'clearly notify the prospective

---

[20]     *Id.* at 348.

[21]     *Id*. at 350.

releasor . . . of the effect of signing the agreement.' "[22]  The list of inherent risks uses very simple language:  "cold weather," "[m]y sense of balance," "drowning," "[a]ccidents or illnesses," and "[f]atigue, chill and/or dizziness."

The Release extends to other activities such as "glacier hiking and ice climbing," but any ambiguity is cleared up by the explicit list of inherent risks relating to whitewater rafting.  We therefore conclude that the Release brings home to the reader its intent to waive liability for negligence using simple language and emphasized text.

### D.    The Release Does Not Violate Public Policy.

*Donahue* requires that "the release must not violate public policy."[23] Citing no legal authority, the Estate asserts that NOVA's waiver "unquestionably violates public policy due to its vast scope."

"Alaska recognizes that recreational releases from liability for negligence are not void as a matter of public policy, because to hold otherwise would impose unreasonable burdens on businesses whose patrons want to engage in high-risk physical activities."[24]  In evaluating public policy arguments in the context of liability waivers, we have previously considered "[o]f particular relevance . . . the type of service performed and whether the party seeking exculpation has a decisive advantage in bargaining strength because of the essential nature of the service."[25]  The type of service likely to inspire additional scrutiny on public policy grounds is "a service of great importance to the public, which is often a matter of practical necessity for some members

---

[22]    *Id.* at 351 (quoting *Kissick*, 816 P.2d at 191).

[23]    *Id.* at 348.

[24]    *Id.* at 348 n.34 (citing *Kissick*, 816 P.2d at 191).

[25]    *Moore v. Hartley Motors, Inc.*, 36 P.3d 628, 631 (Alaska 2001) (citing *Municipality of Anchorage v. Locker*, 723 P.2d 1261, 1265 (Alaska 1986)).

of the public.' "[26]  Using this analysis, we deemed an all-terrain vehicle safety course "not an essential service," meaning that "the class providers did not have a 'decisive advantage of bargaining strength' in requiring the release for participation in the class."[27]

Similarly, here, whitewater rafting, far from being a matter of practical necessity, is an optional activity, meaning that under *Moore v. Hartley Motors, Inc.*, NOVA did not have an advantage in bargaining strength.  We therefore conclude that the Release does not violate public policy.

**E.    The Release Suggests An Intent To Exculpate NOVA From Liability For Employee Negligence.**

*Donahue* provides that "if a release seeks to exculpate a defendant from liability for acts of negligence unrelated to inherent risks, the release must suggest an intent to do so."[28]  But regardless of whether acts of negligence are related to inherent risks, this requirement is met when "the injury and its alleged causes are all expressly covered in the release."[29]  The Estate argues that the Release does not suggest an intent to exculpate NOVA from liability for employee negligence.  We disagree.

As we have explained, the Release specifically covered employee negligence by including "employees" in the clause releasing NOVA from liability for negligence.  Because the injury — death by drowning — and its alleged cause —

---

[26]    *Id*. (quoting *Locker*, 723 P.2d at 1265).

[27]    *Id*. at 631-32 (citing *Locker*, 723 P.2d at 1265).

[28]    *Donahue*, 331 P.3d at 348.

[29]    *Id*. at 352.

employee negligence — are expressly included in the Release, it satisfies this *Donahue* element.[30]

The Estate correctly notes that the *Donahue* release specifically covered the risk of "inadequate warnings or instructions" from employees, unlike the general reference to employee negligence here.[31] Ideally NOVA's Release would include a more detailed description of the types of negligence it covers, such as "employee negligence" and "negligent training." But doing so is not a requirement under *Donahue.* We therefore conclude that the Release suggests an intent to exculpate NOVA from liability for acts of employee negligence.[32]

**F.    The Release Does Not Represent Or Insinuate Standards Of Safety Or Maintenance.**

*Donahue* provides that "the release agreement must not represent or insinuate standards of safety or maintenance."[33] The Estate argues that the Release violates this element with the following statement: "the concessionaire has taken reasonable steps to provide you with appropriate equipment and/or skilled guides so you can enjoy an activity for which you may not be skilled." But this statement is introduced by the word "[a]lthough" and falls *within the same sentence* as the disclosure that "this activity is not without risk." This sentence is immediately followed by a sentence

---

[30]    We further observe that the Release's list of inherent risks tracks some of the Estate's allegations about employee negligence. For example, the Estate alleged that NOVA "fail[ed] to preclude those participants who were not qualified to handle the rafting trip," but the Release discloses that a participant's "ability to swim . . . and/or follow instructions" was an inherent risk of the trip.

[31]    *Donahue*, 331 P.3d at 352.

[32]    We therefore do not reach the question whether employee negligence is unrelated to inherent risks of guided whitewater rafting. *See id*. at 348.

[33]    *Id.*

indicating that "[c]ertain risks cannot be eliminated without destroying the unique character of the activity." And the Release goes on to list 11 risks inherent in whitewater rafting. Reading the Release as a whole, we cannot conclude that it represented or insinuated standards of safety or maintenance.

We noted that the release in *Donahue* "highlight[ed] the fallibility of [the defendant's] employees, equipment, and facilities."[34] Here, though the Release does not — and was not required to under the *Donahue* elements — go that far, it does list as inherent risks "[l]oss of control of the craft" and "sinking of the craft," raising the possibility of human error, fallible equipment, and adverse forces of nature. The Release also makes various references to the isolated, outdoor nature of the activity — listing "[c]hanging water flow," "inclement weather," and the "remote" location as inherent risks.

The Estate cites *Ledgends, Inc. v. Kerr*[35] in support of its argument that the Release impermissibly both represents a standard of maintenance and tries to disclaim liability for failing to adhere to it. In *Kerr*, we concluded that a release that contained statements such as "[w]hile we try to make the [premises] safe" and "[w]hile we strive to provide appropriate equipment for people of all abilities and to keep the equipment in good condition" was invalid because, read as a whole, it did "not conspicuously and unequivocally alert" participants of its scope.[36] We went on to hold that "[t]he representations in the release regarding the [defendant]'s own efforts toward safety

---

[34]    *Id.* at 352.

[35]    91 P.3d 960 (Alaska 2004). Like *Donahue*, *Kerr* also arose out of an injury at an indoor rock climbing gym. *Id.* at 961.

[36]    *Id.* at 963-64.

suggest that the release was predicated on a presumption that the [defendant] would strive to meet the standards of maintenance and safety mentioned in the release."[37]

But the Release in question here is dissimilar in key ways. Compared to the release in *Kerr*, which contained language representing safety standards throughout,[38] NOVA's Release contains only a single half-sentence to that effect, adequately disclaimed: "Although the concessionaire has taken reasonable steps to provide you with appropriate equipment and/or skilled guides so you can enjoy an activity for which you may not be skilled, this activity is not without risk. Certain risks cannot be eliminated without destroying the unique character of the activity." And the release in *Kerr* was much broader — promising to "try to make the [premises] safe" — than NOVA's Release, which promises merely that the company takes "reasonable steps to provide . . . appropriate equipment and/or skilled guides" while acknowledging in context that these precautions could not mitigate all the risks posed by a whitewater rafting trip. The Estate's reliance on *Kerr* is thus misplaced, and we conclude that the Release does not represent or insinuate standards of safety or maintenance.

Because it satisfies the six *Donahue* elements, the Release effectively waived NOVA's liability for negligence.

## V.    CONCLUSION

For the reasons explained above, we AFFIRM the superior court's grant of summary judgment in favor of NOVA.

---

[37]      *Id*. at 963.

[38]      *Id*. at 963-64.

WINFREE, Justice, with whom CARNEY, Justice, joins, dissenting.

I respectfully dissent from the court's decision affirming summary judgment in this case. I cannot agree with the court's conclusions that the self-titled "Participant's Acknowledgement [sic] of Risks"[1] form actually is something other than what it calls itself — i.e., a "Release" form — and that it constitutes a valid release barring the Morton estate's claims against NOVA River Runners.[2] I would reverse the superior court's decision, hold that the purported release is not valid under our precedent, and remand for further proceedings.

The court's application of the six factors we approved in *Donahue v. Ledgends, Inc.*[3] ignores our prior case law from which these factors derived. Most salient to the factual situation and document at issue here is *Ledgends, Inc. v. Kerr*, affirming a superior court decision denying summary judgment based on a release document — titled "Release of Liability — Waiver of Claims" — that was far clearer, and certainly not less clear, than the purported release in this case.[4] And although our prior cases about recreational releases have not focused on a document's title, a title alerts a reader to the document's purpose. In each case from which the *Donahue* factors derived, the document's title clearly told the signer that the document was a release or

---

[1]     The document is referred to by its title throughout, but the spelling has been changed to conform to our preferred style.

[2]     The Participant's Acknowledgment of Risks form signed by Stephen Morton is Appendix A to this dissent.

[3]     331 P.3d 342, 348 (Alaska 2014).

[4]     91 P.3d 960, 961 (Alaska 2004). The release language in *Kerr* was included as an appendix to our opinion. *Id.* at 963-64. The rejected release from *Kerr* is Appendix B to this dissent for ease of comparison with the purported release in this case.

that the signer was waiving legal claims. The release in *Donahue* was titled "Participant Release of Liability, Waiver of Claims, Assumption of Risks, and Indemnity Agreement — Alaska Rock Gym."[5] In *Kerr* the form was a "Release of Liability — Waiver of Claims."[6] The rider-safety school in *Moore v. Hartley Motors, Inc.* presented the participant a form that instructed "You Must Read and Sign This Consent Form and Release."[7] Only in *Kissick v. Schmierer* did the title of the document not contain the word "release," but that form, provided by the U.S. Air Force, was a "Covenant Not to Sue and Indemnity Agreement"[8] — a title giving notice that the signer was surrendering legal rights before participating in the activity. In contrast, an "Acknowledgment of Risks" in no way alerts a reader of the possibility of waiving all negligence related to an activity. A title indicating that a document will release or waive legal liability surely is a useful starting point for evaluating the validity of a recreational release.

Consistent with the principle that the purpose of contract interpretation is to give effect to the parties' reasonable expectations,[9] our prior cases require us to consider the agreement as a whole[10] and to resolve "any ambiguities in pre-recreational exculpatory clauses . . . against the party seeking exculpation."[11] The agreement as a

---

[5]    331 P.3d at 344.

[6]    91 P.3d at 961.

[7]    36 P.3d 628, 632 (Alaska 2001).

[8]    816 P.2d 188, 190 (Alaska 1991).

[9]    *See Peterson v. Wirum*, 625 P.2d 866, 872 n.10 (Alaska 1981). A release is a type of contract. *See Moore*, 36 P.3d at 630-31.

[10]    *Kerr*, 91 P.3d at 962.

[11]    *Id.* at 961 (citing *Kissick*, 816 P.2d at 191).

whole "must 'clearly notify the prospective releasor or indemnitor of the effect of signing the release.' "[12]  Applying these directives to the Acknowledgment of Risks form, I conclude the document does not clearly apprise participants that they are surrendering *all* claims for negligence by NOVA, particularly claims based on inadequate training.

As can be seen in Appendix A, the Acknowledgment of Risks form's first indication that it might be anything more than what its title suggests appears approximately three-fourths of the way down a densely printed page that, up to that point, has mentioned only "inherent risks."  There the form asks participants for a self-evaluation of their abilities.  After a line break, the form asks participants to certify that they are "fully capable of participating in these activities" and will "assume full responsibility for [themselves]."  Then, without another line break or any heading to signify that the form is transitioning into a liability release rather than an acknowledgment of risks, the document sets out "release" language.  While parts of this section are in capital letters, they are not in bold or otherwise set off from the dense text surrounding them.  In short, considering the document as a whole, the apparent intent is to hide the release language at the very bottom of a dense, one-page document with a title completely unrelated to release of liability.

Additionally, the signature page in no way alerts the reader that operative release language is contained on another page, presumably the back side of that page.  The short paragraph at the top, which the court relies on to hold that the form gave participants adequate notice of the release language, says only, "I have read, understood, and accepted the terms and conditions stated herein and acknowledge that this agreement shall be binding upon myself . . . ."  While the court concludes that a reasonable person "would be on notice that the document had another side" solely because of the word

---

[12]     *Id.* at 962 (quoting *Kissick*, 816 P.2d at 191).

"herein," the court fails to explain its conclusion. In fact, Morton's companion who was an experienced adventure traveler as well, Horsman, remembered the document consisting of only one page. As he put it, "[T]he way I read it is 'conditions herein.' Well, there's not much herein . . . ."

In addition to the document's overall structure, the Acknowledgment of Risks form fails to comply with several standards we previously have applied to recreational activity releases. Specifically, the mere inclusion of the word "negligence" in the release language is insufficient to make the Acknowledgment of Risks form a full release of *all* claims. The release we held invalid in *Kerr* also used the word "negligence," but we agreed with the superior court that "[w]hen read as a whole" the purported release did "not clearly and unequivocally express an intent to release the Gym for liability for its own future negligence" with respect to all matters referenced in the release.[13]

The superior court's *Kerr* decision, which we adopted and published as expressing our own view, highlighted the ineffectiveness of a release that did not "clearly alert climbers that they [were] giving up any claims that the Gym failed to meet the standards of maintenance and safety that the Gym specifically indicate[d] in the release that it [would] strive to achieve and upon which the release [might] have been predicated."[14] This is precisely what the Morton estate agues here: the Acknowledgment of Risks form promised participants that NOVA would provide adequately skilled guides but did not alert participants that they were giving up claims based on NOVA's negligent failure to provide adequately skilled guides.

---

[13]     *Id.* at 963.

[14]     *Id.*

NOVA indicated in its Acknowledgment of Risks form that it had "taken reasonable steps to provide [a participant] with appropriate equipment and/or skilled guides so [the participant] can enjoy an activity for which [he] may not be skilled." This is a representation that NOVA's guides were adequately skilled to provide participants an enjoyable trip — not one fraught with danger.[15] The Morton estate alleged in its complaint that NOVA's guides were inadequately trained and did not properly screen participants to preclude those who were unable "to handle the rafting trip" from participating. Both specific allegations related to negligent training or failure to provide guides who were adequately skilled to assist unskilled participants to safely complete the trip. The Acknowledgment of Risks form, like the defective release in *Kerr*, can hardly be said to give a participants notice that the participants were surrendering claims related to negligent training or supervision.[16]

The court concludes otherwise because the express statement that NOVA would provide skilled guides is in a sentence that also says rafting "is not without risk" and the Acknowledgment of Risks form then lists several inherent risks of rafting. But none of the listed risks is in any way related to unskilled guides or negligence in screening other participants.[17] To the contrary, the enumerated risks focus on

---

[15] The release could be read as requiring NOVA to provide either "appropriate equipment" or "skilled guides" but not both. But a reasonable person with no skill in rafting would almost certainly infer that NOVA intended to provide both appropriate equipment and skilled guides on a trip with Class V rapids.

[16] *See Kerr*, 91 P.3d at 963 (holding that release did not bar negligent maintenance claim because release promised to "strive to achieve" safety standards).

[17] In contrast, the valid release we discussed in *Donahue* explicitly listed *in the inherent risks of climbing* several types of possible negligence: "improperly maintained equipment," "displaced pads or safety equipment, belay or anchor or harness failure," "the negligence of other climbers or spotters or visitors or participants who may

environmental and personal factors and include natural conditions, such as "[c]hanging water flow," "presence of marine life," and adverse weather; personal characteristics of the participant like "sense of balance, physical coordination, ability to swim, walk and/or follow instructions" and "[f]atigue, chill and/or dizziness, which may diminish [the participant's] reaction time and increase the risk of accident"; and the risk of an accident "occurring in remote places where there are no available medical facilities." The Acknowledgment of Risks form does not include — as the release in *Donahue* did — risks related to other participants' "limits"[18] or to employees' "inadequate warnings or instructions" that might lead to injury.[19] In other words, the Acknowledgment of Risks form did not meet the fourth characteristic of a valid release — it did not suggest an intent to release NOVA from liability for negligent acts unrelated to inherent risks.[20]

I also disagree with the court's holding that a release is necessarily valid when it sets out the risk of a specific injury — death by drowning in this case — but not its specific cause — negligent training and the provision of unskilled guides. In *Donahue* we rejected the participant's argument that the release did not specifically and

---

be present," "participants giving or following inappropriate 'Beta' or climbing advice or move sequences," and "others' failure to follow the rules of the [Rock Gym] . . . ." *Donahue v. Ledgends, Inc.*, 331 P.3d 342, 350 n.46 (Alaska 2014) (alteration in original).

[18] *Id.*

[19] *See id.* at 352 (holding that release at issue "expressly covered" both the type of injury "and its alleged causes," namely " 'inadequate warnings or instructions' from Rock Gym instructors").

[20] The court states that it "do[es] not reach the question of whether employee negligence is unrelated to inherent risks of guided whitewater rafting." It is hard to see how negligent training or providing inadequately skilled guides would ever be related to an inherent risk of guided whitewater rafting.

clearly set out the risks being waived because the release not only warned of a risk of falling but also cautioned that instructors and other employees could, through their negligence, cause falls or other types of injury.[21] Here the only mention of employee negligence, buried at the bottom of a densely written, single-spaced document, is a description only in the most general terms. This type of general waiver simply does not specifically and clearly set out a waiver of the risk on which the Morton estate's claim is based. The Morton estate alleges that Morton's death by drowning was not due solely to the inherent risks of whitewater rafting the release listed, but rather to the provision of unskilled guides who did not adequately screen other participants. The document's general language fails to specifically and clearly set out the risk of negligence alleged here.

Today's decision allows intentionally disguised pre-recreational activity exculpatory releases and effectively lowers the bar for their validity. Because the release does not meet the standards adopted in the precedent *Donahue* relied on — and because if the "Release" in *Kerr* was an invalid release, the "Participant's Acknowledgment of Risks" Morton signed must be an invalid release — I respectfully dissent from the court's opinion concluding otherwise.

---

[21]     *Donahue*, 331 P.3d at 348-49.

## Participant's Acknowledgement of Risks

WARNING: There are significant elements of risk in any adventure, sport or activity associated with the outdoors and/ or wilderness and the use or presence of watercraft, including but not limited to kayaks, rafts, oar boats and glacier hiking and ice climbing equipment, including crampons, ski poles, climbing harnesses and associated ice climbing hardware (referred to herein as "activities"), and the use of any related equipment.

In consideration of the services of NOVA RIVERRUNNERS INC., their officers, agents, employees, and stockholders, and all other persons or entities associated with those businesses (hereinafter collectively referred to as "the concessionaire"), I agree as follows:

Although the concessionaire has taken reasonable steps to provide you with appropriate equipment and/or skilled guides so you can enjoy an activity for which you may not be skilled, we wish to remind you this activity is not without risk. Certain risks cannot be eliminated without destroying the unique character of the activity. The same elements that contribute to the unique character of the activity can be causes of loss or damage to your equipment, or accidental injury, illness or in extreme cases, permanent trauma or death. We do not want to frighten you or reduce your enthusiasm for the activity, but we do think it is important for you to know in advance what to expect and to be informed of the inherent risks. The following describes some, but not all, of those risks:

1: Changing water flow:
2: Collision, with other participants, any portion of the interior of the craft, other watercraft, man-made or natural objects, including overhanging, submerged and/or semi submerged trees, branches, rocks, boulders and ice:
3: Cold weather and heat related injuries and illnesses including frostbite, heat exhaustion, sunstroke, and dehydration:
4: Inclement weather, lightning, variances and extremes of wind, weather and temperature encounter with or attack by insects, reptiles, and animals:
5: My sense of balance, physical coordination, ability to swim, walk and/or follow instructions:
6: Loss of control of the craft, collision, capsizing, and sinking of the craft, which can result in wetness, injury, exposure to the elements, hypothermia and/or drowning:
7: Getting in or out of the craft:
8: Travel, including hiking, portaging, and travel to or from the activity:
9: The presence of marine life forms:
10: Accidents or illnesses occurring in remote places where there are no available medical facilities.
11: Fatigue, chill and/or dizziness, which may diminish my/our reaction time and increase the risk of accident. I am aware that this activity entails risks of injury or death to myself. I understand the description of these risks is not complete and that other unknown or unanticipated risks may result in injury, illness, or death. I agree to assume responsibility for the risks identified herein and those risks not specifically identified. My participation in this activity is purely voluntary. No one is forcing me to participate. And I elect to participate in spite of the risks.

I possess at least the following qualifications, which I understand are prerequisites to participate in this activity:

A, I am (we are) physically and mentally capable of participating in the activity and/or using the equipment.

B, I am (we are) safety conscious and acknowledge that wearing a U.S. Coast Guard approved personal flotation device ("PFD") while in or upon the watercraft is a basic safety precaution and is required. I/we will consider wearing a helmet when running rapids equivalent to or greater than the AWA Class IV.

C, I recognize that if there are "foot cups" in a craft, they may assist in stabilizing participants and keeping them from falling out of the craft. I am aware however, their use may present an increased risk of knee, ankle, or other injuries as a result of restricted movement. Any use is strictly voluntary and at my/our own risk.

D. I recognize that I will be outfitted with helmet, crampons and a ski pole for glacier hiking trips. I am aware however their use can contribute to tripping and falling which may incur injuries. Any use is at my own risk.

I certify that I am (we are) fully capable of participating in these activities. Therefore, I assume full responsibility for myself, including any minor children, for which I am responsible, for bodily injury, accidents, illnesses, death, loss of personal property, and expenses thereof as a result of those inherent risks and dangers.

I myself and on behalf of my/our heirs, assigns, personal representatives and next of kin, HEREBY RELEASE NOVA RIVERRUNNERS INC., its officers, officials, agents and/or employees, other participants, sponsoring agencies, sponsors, advertisers, and, if applicable, owners and lessors of premises used to conduct the event ("Releasees"), WITH RESPECT TO ANY AND ALL INJURY, DISABILITY, DEATH, or loss, or damage to persons or property incident to my involvement or participation in these programs, WHETHER ARISING FROM NEGLIGENCE OF THE RELEASEES OR OTHERWISE, to the fullest extent permitted by law.

I, for myself and on behalf of my/our heirs, assigns, personal representatives and next of kin, HEREBY INDEMNIFY AND HOLD HARMLESS all the above Releasees from any and all liabilities incident to my involvement or participation in these programs, EVEN IF ARISING FROM THEIR NEGLIGENCE to the fullest extent permitted by law.

I release claim to and allow the use of any photographic or video material of myself taken by NOVA for the purpose of marketing their activities.

Appendix A - 1 of 2

*1669*

# NOVA RIVER RUNNERS
## 907.745.5753

I have read, understood, and accepted the terms and conditions stated herein and acknowledge that this agreement shall be binding upon myself, my heirs, assigns, personal representative, and estate, and for all members of my family including any minors accompanying me.

**Participant's Name:**   **Age**   **Signature/Date**

PETER HORSMAN   41   05/27/13

Emergency Contact: ANU HORSMAN   Phone: 425 / 6988486

List known allergies to plants, insects, medications: LATEX ALLERGY

Describe if currently under a doctor's care or taking medications:

If participant is **under 18**, the parent or Legal Guardian must also sign:

**Participant's Name:**   **Age**   **Signature/Date**

STEVE MORTON   47   05/27/13

Emergency Contact: UNGUN CANGUIC   Phone: /

List known allergies to plants, insects, medications: NONE

Describe if currently under a doctor's care or taking medications: NIA

If participant is **under 18**, the parent or Legal Guardian must also sign:

**Participant's Name:**   **Age**   **Signature/Date**

Adrian Hendricks   49   05/22/13

Emergency Contact: James Palmer   Phone: 303 / 573 2907 hm
303 588 6714 cell

List known allergies to plants, insects, medications:

Describe if currently under a doctor's care or taking medications:

If participant is **under 18**, the parent or Legal Guardian must also sign:

Appendix A - 2 of 2

-23-

*1669*

FOR USE BY ADULT                    Climber's Name:_____
GYM USER

## RELEASE OF LIABILITY - WAIVER OF CLAIMS

1.    Familiarize Yourself with the Alaska Rock Gym.

Climbing, exercising and other activities involve certain risks. It is very important that you look around the Alaska Rock Gym before you climb or exercise here so that you understand the nature of the Gym and the activities that happen here. Please feel free to visit the Gym anytime for a tour. Watch people climb. Our staff will be more than happy to show you around and answer any questions you may have.

2.    Understand Any Risks.

The Alaska Rock Gym is a place for physical exercise, notably climbing, and there are risks inherent in any physical activity. These can range from things as simple as slipping on a floor or dropping a barbell to things as complicated as a failure of equipment or climbing structures or the inattention of another climber. While we try to make the Gym a safe place, it is ultimately up to you to understand the risks BEFORE engaging in any physical activity. Understand your own physical limits. If you have not been involved in a regular course of exercise, it is always a good idea to check with your doctor before beginning. Finally, the Alaska Rock Gym is a public place. Please safeguard your personal property. The Alaska Rock Gym cannot be liable for any loss or damage to personal property or possessions.

3.    Use of Equipment and Rentals

The Alaska Rock Gym sells and rents equipment and other items, and it provides other equipment, such as ropes, carabiners, and exercise equipment, for the use of its customers. While we strive to provide appropriate equipment for people of all abilities and to keep the equipment in good condition, it remains to you, the user, to educate yourself as to the proper use of the equipment. Please ask any staff member if you have any questions. Inspect your equipment closely. The Alaska Rock Gym shall not be liable for any injuries, damages or loss resulting from any defect, visible or hidden, in any equipment sold, rented or provided by Alaska Rock Gym.

Appendix B - 1 of 2

4.   Release of Liability.

By signing below, you certify and agree that:

> ● there is no medical reason why you could not participate in activities at the Alaska Rock Gym;
> ● you have had full opportunity to inspect the Gym, and you understand the activities that are carried out here;
> ● you release the Alaska Rock Gym, its owners, operators, employees, or insurers from any liability arising from or related to the use of the Alaska Rock Gym by you or your guests, including any physical or mental injury, death or property loss. This release means you waive any right to make a claim against or sue the Alaska Rock Gym or the other listed parties for any injury or loss of any kind, regardless of whether the injury was allegedly caused by the negligence of the Gym or its staff, other users of the Gym, a defect in equipment, structures, building or parking lot, or any other cause.

THIS WAIVER OF CLAIMS IS GIVEN IN PARTIAL CONSIDERATION FOR PERMISSION TO USE THE ALASKA ROCK GYM, AND IT WILL CONTINUE TO APPLY DURING EACH VISIT TO THE ALASKA ROCK GYM IN THE FUTURE UNTIL YOU REVOKE IT IN WRITING.

I HAVE READ THIS RELEASE. I UNDERSTAND ITS CONTENT. I AGREE TO ITS TERMS.

_____     Date:_____
Climber's Signature

Appendix B - 2 of 2